# IN THE SUPREME COURT OF IOWA

No. 33 / 06–1753

Filed August 29, 2008

**CITY OF DAVENPORT,**

Appellee,

vs.

**THOMAS J. SEYMOUR,**

Appellant.

_____

Appeal from the Iowa District Court for Scott County, Mary E. Howes, District Associate Judge.

Defendant challenges the legality of the Davenport Automated Traffic Enforcement ordinance. **AFFIRMED.**

Michael J. McCarthy of McCarthy, Lammers & Hines, Davenport, and Randall C. Wilson of ACLU of Iowa Foundation, Inc., Des Moines, for appellant.

Christopher S. Jackson, Davenport, for appellee.

**APPEL**, **Justice.**

In this case, the court must decide whether traffic regulations and enforcement mechanisms contained in Iowa Code chapter 321 and other code provisions were intended by the legislature to prohibit a municipality from establishing an automatic traffic enforcement system through which the city levels civil penalties against the owners of vehicles that fail to obey red light traffic signals or violate speed laws. Applying our well-established method of preemption analysis, we hold that the legislature has not preempted this automatic traffic enforcement ordinance through these statutory provisions.

## I. Factual and Procedural Background.

If the twentieth century may be characterized as the Era of the Automobile, it was also the Era of Automobile Regulation. In 1902, officers in Westchester County, New York, concealed themselves in fake tree trunks at specified intervals and, armed with stop watches and telephones, attempted to detect and apprehend speeders. Not to be outdone, innovative constables in Massachusetts in 1909 deployed a method of detecting speeding motorists that used a combination of a camera and a stop watch. *See Commonwealth v. Buxton*, 91 N.E. 128 (Mass. 1910). These comparatively simple approaches to traffic law enforcement were subsequently replaced in the 1940s and 1950s by "radar" detection systems. Attacked as Orwellian when first introduced, the use of radar is now a standard tool of law enforcement.

Innovation in traffic management has not been limited to speed control. As every motorist knows, automated stop lights have come to replace the blue-suited patrolman with outstretched arms engaged in perpetual motion with a whistle at the ready. Most municipal authorities

believe police officers have better things to do than to control traffic at intersections.

Modern technological advances have also led to the development of more sophisticated "automated traffic enforcement" (ATE) systems. Using a combination of cameras and sensors, the ATEs allow municipal governments to detect traffic violations without a law enforcement officer present on the scene. Promoted by private vendors who have developed and operated the systems, ATE red light cameras were first deployed abroad over thirty-five years ago and according to industry sources are now operational in forty-five countries. Kevin P. Shannon, *Speeding Towards Disaster: How Cleveland's Traffic Cameras Violate the Ohio Constitution*, 55 Clev. St. L. Rev. 607, 610 (2007). As of 2005, ATE speed detection systems were in use in as many as seventy-five countries. *Id.*

In this country, speed cameras have been utilized on a limited basis in several states, including Arizona, California, North Carolina, Ohio, Oregon, and the District of Columbia. Red light systems have also been utilized by a number of municipalities, including those in Arizona, California, Virginia, and North Carolina. *Id.* at 611.

The advent of automatic traffic enforcement has prompted legislative action in a number of jurisdictions. Some state legislatures have elected expressly to authorize local governments to establish ATE systems provided that certain statutory requirements are met, including posting notice to drivers that automated traffic devices are in use. *See, e.g.*, Colo. Rev. Stat. § 42–4–110.5 (2008); N.C. Gen. Stat. § 160A–300.1 (2007). Other states have authorized ATE ordinances only in the vicinity of schools, residency zones, or railroad crossings. *See, e.g.*, Ark. Code §§ 27–52–110, 27–52–111 (2007); Md. Code Ann., Transp. § 21–809 (2008). Some states have explicitly prohibited their use. *See, e.g.*, N.J.

Stat. Ann. § 39:4–103.1 (2008); W. Va. Code § 17C–6–7a (2008); Wis. Stat. § 349.02(3) (2008). Most states, like Iowa, have no legislation directly addressing the issue.

In 2004, the City of Davenport enacted an ordinance entitled "Automatic Traffic Enforcement." Davenport Mun. Code § 10.16.070 (2005). The Davenport ATE ordinance authorized the city to install cameras and vehicle sensors at various locations in the city to make video images of vehicles that fail to obey red light traffic signals or speeding regulations. The information obtained from these automated devices is then forwarded to the Davenport Police Department for review. The Davenport police then determine whether there has been a violation of the city's traffic control ordinances.

Under the Davenport ATE ordinance, a vehicle owner is issued a notice and is liable for a civil fine as a result of any detected violation. A vehicle owner may rebut the city's claim by showing that a stolen vehicle report was made on the vehicle which encompassed the time in which the violation allegedly occurred. Citations issued pursuant to the Davenport ATE ordinance are not reported to the Iowa Department of Transportation (IDOT) for the purpose of the vehicle owner's driving record.

A recipient of an automated traffic citation may dispute the citation by requesting the issuance of a municipal infraction citation. If so disputed, the recipient is entitled to a trial before a judge or magistrate. In the event the disputing vehicle owner is found to have violated the ordinance, state-mandated court costs are added to the amount of the violation.

Thomas J. Seymour felt the sting of the Davenport ATE ordinance on April 28, 2006. He received a citation alleging that his vehicle

traveled forty-nine miles per hour in a thirty-five mile-per-hour zone on March 17, 2006. Seymour contested the citation.

Seymour's case was tried to a magistrate on a stipulated record. Seymour claimed that the ATE ordinance violated due process by shifting the burden of proof to the defendant to disprove a citation, by depriving a defendant of the presumption of innocence, by changing the burden of proof from the reasonable doubt standard to the lesser standard of clear, satisfactory, and convincing evidence, and by shifting liability to vehicle owners, not drivers. Seymour also claimed that the Davenport ATE ordinance was invalid because it was preempted by traffic regulations and enforcement mechanisms contained in Iowa Code chapter 321 and sections 364.22(5)(*b*), 805.6, and 805.8A.

The magistrate rejected all of Seymour's claims, found that he violated the ordinance, and entered judgment against him. Seymour appealed to the district court, which affirmed the judgment.

We granted Seymour's application for discretionary review. While Seymour raised constitutional challenges based on due process in the lower courts, he has not pressed these claims on appeal and, as a result, these issues are not before us. The only issue raised in this appeal is whether the Davenport ATE ordinance is preempted because it is inconsistent or contrary to Iowa's statewide traffic laws as cited by Seymour.

## II. Standard of Review.

A trial court's determination of whether a local ordinance is preempted by state law is a matter of statutory construction and is thus reviewable for correction of errors at law. *State v. Tarbox,* 739 N.W.2d 850, 852 (Iowa 2007).

**III. Discussion.**

**A. Principles of Preemption Analysis.** The central issue in this case is whether the provisions of the Davenport ATE ordinance are preempted by traffic regulation and enforcement provisions of Iowa Code chapter 321 (laws of the road) and sections 364.22(5)(*b*) (municipal infractions), 805.6 (form of citation in criminal cases), and 805.8A (schedule of criminal fines). An overview of the principles of preemption analysis provides the framework for resolution of the issue presented on appeal.

In 1968, the Iowa Constitution was amended to provide municipal governments with limited powers of home rule. Iowa Const. art. III, § 38A. The home rule amendment established what we have referred to as legislative home rule. *Berent v. City of Iowa City*, 738 N.W.2d 193, 196 (Iowa 2007). Under legislative home rule, the legislature retains the unfettered power to prohibit a municipality from exercising police powers, even over matters traditionally thought to involve local affairs. Conversely, as long as an exercise of police power over local affairs is not "inconsistent with the laws of the general assembly," municipalities may act without express legislative approval or authorization. Iowa Const. art. III, § 38A. City authorities are no longer frightened by Dillon's ghost.[1]

In order to determine whether municipal action is permitted or prohibited by the legislature, courts have developed the doctrine of preemption. The general thrust of the preemption doctrine in the context of local affairs is that municipalities cannot act if the legislature has

---

[1]In 1868, the Chief Justice of the Iowa Supreme Court, John F. Dillon, declared that municipalities were creatures of the legislature and had only those powers expressly granted by the legislature. *City of Clinton v. Cedar Rapids & Mo. River R.R.,* 24 Iowa 455, 475 (1868). Later this rule became known as the Dillon Rule.

directed otherwise. When exercised, legislative power trumps the power of local authorities.

We have recognized three types of preemption. The first type, generally known as express preemption, applies where the legislature has specifically prohibited local action in a given area. *Goodell v. Humboldt County*, 575 N.W.2d 486, 492–93 (Iowa 1998); *Chelsea Theater Corp. v. City of Burlington*, 258 N.W.2d 372, 373 (Iowa 1977). In cases involving express preemption, the specific language used by the legislature ordinarily provides the courts with the tools necessary to resolve any remaining marginal or mechanical problems in statutory interpretation.

Where the legislature seeks to prohibit municipal action in a particular subject area, express preemption offers the highest degree of certainty with the added benefit of discouraging unseemly internecine power struggles between state and local governments. Express preemption is most consistent with the notion that "[l]imitations on a municipality's power over local affairs are not implied; they must be imposed by the legislature." *City of Des Moines v. Gruen*, 457 N.W.2d 340, 343 (Iowa 1990).

Nonetheless, this court has found that express preemption alone is not a sufficient tool to vindicate legislative intent in all circumstances. In order to ensure maximum loyalty to legislative intent, this court has developed the residual doctrine of implied preemption, notwithstanding language in our cases disapproving of implied limitations on municipal power. Implied preemption arises in two situations where the intent of the legislature to preempt is apparent even though the legislature did not expressly preempt in unambiguous language.

Implied preemption occurs where an ordinance prohibits an act permitted by statute, or permits an act prohibited by statute. *Goodell*, 575 N.W.2d at 493; *Gruen*, 457 N.W.2d at 342. Under these circumstances, although there is no express preemption, the statute on its face contains a command or mandate that by its very nature is preemptory. The theory of this branch of implied preemption is that even though an ordinance may not be expressly preempted by the legislature, the ordinance cannot exist harmoniously with a state statute because the ordinance is diametrically in opposition to it. The exclamation point of an express preemption provision is simply redundant in light of the mandatory legislative expression. Although we used the label "implied preemption" to distinguish it from express preemption, this type of preemption is perhaps more accurately described as "conflict preemption." *See, e.g., Colacicco v. Apotex Inc.*, 521 F.3d 253, 261 (3d Cir. 2008); *Mars Emergency Med. Servs., Inc. v. Twp. of Adams*, 740 A.2d 193, 195 (Pa. 1999).

Although implied preemption of the conflict variety occurs frequently, the legal standard for its application is demanding. In order to qualify for this branch of implied preemption, a local law must be "irreconcilable" with state law. *Gruen*, 457 N.W.2d at 342. Further, our cases teach that, if possible, we are to "interpret the state law in such a manner as to render it harmonious with the ordinance." *Id.*; *see also Iowa Grocery Indus. Ass'n v. City of Des Moines*, 712 N.W.2d 675, 680 (Iowa 2006); *City of Iowa City v. Westinghouse Learning Corp.*, 264 N.W.2d 771, 773 (Iowa 1978). In applying implied preemption analysis, we presume that the municipal ordinance is valid. *Iowa Grocery*, 712 N.W.2d at 680. The cumulative result of these principles is that for

implied preemption to occur based on conflict with state law, the conflict must be obvious, unavoidable, and not a matter of reasonable debate.

A second form of implied preemption occurs when the legislature has so covered a subject by statute as to demonstrate a legislative intent that regulation in the field is preempted by state law. Like implied preemption based on conflict, the test for field preemption is stringent. Extensive regulation of area alone is not sufficient. *Goodell*, 575 N.W.2d at 493; *City of Council Bluffs v. Cain*, 342 N.W.2d 810, 812 (Iowa 1983). In order to invoke the doctrine of field preemption, there must be some clear expression of legislative intent to preempt a field from regulation by local authorities, or a statement of the legislature's desire to have uniform regulations statewide. *Goodell*, 575 N.W.2d at 499–500; *City of Vinton v. Engledow*, 258 Iowa 861, 868, 140 N.W.2d 857, 861 (1966). The notion behind field preemption is that the legislature need not employ "magic words" to close the door on municipal authority. Yet, courts are not to speculate on legislative intent, even in a highly regulated field. There must be persuasive concrete evidence of an intent to preempt the field in the language that the legislature actually chose to employ. *Goodell*, 575 N.W.2d at 493.

Field preemption is a narrow doctrine that cannot be enlarged by judicial policy preferences. In determining the applicability of field preemption, this court does not entertain arguments that statewide regulation is preferable to local regulation or vice versa, but focuses solely on legislative intent as demonstrated through the language and structure of a statute. *Id.* at 498–99.

In this case, the parties agree that the legislature has not expressly preempted the Davenport ATE ordinance. The only question is whether

one of the branches of implied preemption applies in light of the statutory provisions cited by Seymour.

**B. Application of Preemption Principles to the ATE Ordinance.**

1. *Relevant statutory provisions.* Entitled "Motor Vehicles and the Law of the Road," Iowa Code chapter 321 contains 562 sections. Among other things, Iowa Code chapter 321 establishes substantive standards related to speeding, obeying traffic signals, and establishes mechanisms of enforcement. Iowa Code §§ 321.285, 321.256. Infractions for speeding and violating traffic signals are generally considered simple misdemeanors. *Id.* § 321.482. Convictions for violation of these criminal statutes are reported to the IDOT and can result in suspension or revocation of driving privileges where the driver has committed multiple offenses within a prescribed statutory period. *Id.* §§ 321.201–.215.

Of central concern to the preemption challenge in this case is Iowa Code section 321.235, which provides:

> The provisions of this chapter shall be applicable and *uniform throughout this state* and in all political subdivisions and municipalities therein and no local authority shall enact or enforce any rule or regulation in conflict with the provisions of this chapter unless expressly authorized herein. Local authorities may, however, adopt *additional traffic regulations which are not in conflict with the provisions of this chapter.*

*Id.* § 321.235 (emphasis added). Iowa Code section 321.235 is a two-faced statute. The Janus-like code provision declares that the provisions of the chapter are "applicable and uniform" throughout the state, but then expressly authorizes local governments to enact "additional traffic regulations" that are "not in conflict" with the provisions of the chapter.

The next provision of the code adds additional relevant language. Iowa Code section 321.236 provides:

> Local authorities shall have no power to enact, enforce, or maintain any ordinance, rule or regulation *in any way in conflict with, contrary to or inconsistent with the provisions of this chapter,* and no such ordinance, rule or regulation of said local authorities heretofore or hereafter enacted shall have any force or effect, however the provisions of this chapter shall not be deemed to prevent local authorities with respect to streets and highways under their jurisdiction and within the reasonable exercise of police power from: [list of fourteen exceptions].

*Id.* § 321.236 (emphasis added). The fourteen listed exceptions in this section give municipalities or rural residence districts the power to prescribe standards of conduct. Under the listed exceptions, municipalities are expressly authorized to regulate conduct related to the parking of vehicles, processions or assemblages on highway, traffic flow on highways locally designated for one-way traffic, speed in public parks, designation of highways as a through highway requiring intersecting traffic to yield, operation of vehicles for hire, use of highways by heavy trucks and rubbish vehicles, turning of vehicles at and between intersections, the operation of bicycles, speed limits in public alleys, use of highways during snow conditions, and the operation of electric personal assistive mobility devices. *Id.*

The only exception contained in Iowa Code section 321.236 that does not expressly authorize limitations of conduct in a specific subject area is the penultimate listed exception, which authorizes boards of supervisors to create rural residence districts. *Id.* But even this provision indirectly relates to regulation of conduct, as rural residence districts created by the board of supervisors are authorized to regulate speed and parking of vehicles within the rural residence district consistent with the provisions of chapter 321.

Another provision of Iowa law cited by Seymour is Iowa Code section 364.22(5)(*b*). This provision of Iowa law authorizes municipalities

to establish civil infractions and provide for enforcement. Among other things, section 364.22(5)(*b*) provides that "[t]he city has the burden of proof that the municipal infraction occurred and that the defendant committed the transaction." The Code provision also provides that the burden of proof for municipal civil infractions is "clear, satisfactory, and convincing evidence." *Id.*

Seymour also cites Iowa Code sections 805.6 and 805.8A in support of his preemption argument. Iowa Code section 805.6 establishes a uniform citation and complaint for criminal infractions related to the rules of the road established in Iowa Code chapter 321. *Id.* § 805.6. Iowa Code section 805.8A establishes a schedule of fines for such criminal violations. *Id.* § 805.8A.

2. *Contentions of the parties.* The parties agree that there are a number of differences between the provisions of Iowa Code chapter 321 and the Davenport ATE ordinance. For example, the Davenport ATE ordinance creates civil penalties while state law provides only for criminal violations; the offense under the Davenport ATE ordinance is against the owner of the motor vehicle rather than the driver; violation of the Davenport ATE ordinance is not reported to the IDOT and made part of the violator's driving record, whereas violations of state law are so reported; the standards of proof in the Davenport ATE ordinance differ from those of state violations, which are criminal; the citation form under the Davenport ATE ordinance is different from that prescribed for criminal violations; and the schedule of municipal civil fines under the Davenport ATE ordinance is different from the schedule for violation of state criminal law.

The parties, however, take opposing views of these differences. The City maintains that the differences between the Davenport ATE

ordinance and the applicable state laws demonstrate that the Davenport ATE ordinance is not contrary to, or inconsistent with state law, but is merely supplemental to provisions of the state code. Seymour, on the other hand, maintains that the differences powerfully demonstrate conflict with state law by creating an entirely new enforcement regime that is wholly absent from chapter 321 and related provisions.

3. *Application of preemption principles.* A number of our cases have explored the question of whether a local ordinance conflicts with state law, thereby triggering implied preemption. For example, in *Iowa Grocery*, we invalidated a Des Moines ordinance that allowed the city to charge an administrative fee related to liquor licenses and permits in the face of a state statute which provided that the Iowa Alcoholic Beverages Division, by rule, shall establish the administrative fee to be assessed by all local authorities. *Iowa Grocery*, 712 N.W.2d at 680. Similarly, in *James Enterprises, Inc. v. City of Ames*, 661 N.W.2d 150, 153 (Iowa 2003), we held that an Ames ordinance which prohibited smoking in restaurants during certain hours was preempted by state law which allowed designated smoking areas in restaurants. In these cases, local ordinances simply could not be reconciled with state law. An additional preemption case of older vintage is *Engledow*, 258 Iowa at 861, 140 N.W.2d at 857. In that case, we invalidated a local ordinance that attempted to change the substantive elements of the crime of reckless driving. *Engledow*, 258 Iowa at 868, 140 N.W.2d at 861.

The above cases demonstrate that the phrase "irreconcilable" used in preemption analysis is a hard-edged term. In order to be "irreconcilable," the conflict must be unresolvable short of choosing one enactment over the other. No such bitter choice is presented in this case. The Davenport ATE ordinance simply cannot be said to authorize

what the legislature has expressly prohibited, or to prohibit what the legislature has authorized. Nothing in Iowa Code chapter 321, or sections 805.6 and 805.8A addresses the question of whether a municipality may impose civil penalties on owners of vehicles through an ATE regime. Whether such penalties may be imposed by a municipality can only be characterized as a question which the legislature did not address.

Using the principles established by our case law regarding implied conflict preemption, namely, that a local ordinance is not impliedly preempted unless it is "irreconcilable," that every effort should be made to harmonize a local ordinance with a state statute, and that implied preemption only applies where a local ordinance prohibits what a state statute allows or allows what a state statute prohibits, we conclude that implied conflict preemption simply does not apply in this case. As stated by the Ohio Supreme Court in *Village of Struthers v. Sokol*, 140 N.E. 519, 521 (Ohio 1923), whether a municipal ordinance is in conflict is not determined by the penalties prescribed, but whether the ordinance permits or licenses that which the state prohibits or forbids or vice versa. *See also Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317–18, 101 S. Ct. 1124, 1130, 67 L. Ed. 2d 258, 265 (1981) (stating conflict in preemption context is to be assessed by examining the activity which the state has attempted to regulate, rather than the method used); 56 Am. Jur. 2d *Municipal Corporations* § 329, at 368–70 (stating state and local regulation may coexist in identical areas although local regulation exacts additional requirements, unless state statute limits requirements by prescription).

We find nothing in Iowa Code section 321.236 to alter our analysis. In this provision, the legislature has expressly authorized local

governments to establish rules of conduct related to rules of the road. The legislature used no words of limitation in the section. Further, as pointed out by the City, the legislature in other sections of the Code has authorized municipal action over traffic subjects not contained in section 321.236. *See, e.g.,* Iowa Code §§ 321.255 (traffic devices), 321.273 (traffic reports), 321.293 (speed). We do not regard the fourteen categories in Iowa Code section 321.236, therefore, as exclusive or as overriding the general command of Iowa Code section 321.235 that authorizes additional traffic regulations where they are not contrary to or inconsistent with state law.

We also reject Seymour's claim that the Davenport ATE ordinance conflicts with Iowa Code section 364.22(5)(*b*). We certainly agree that under this statutory provision, the municipality has the burden of proving all elements of a civil infraction by clear and convincing evidence.[2] But there is nothing in the Davenport ATE ordinance that is inconsistent with Iowa Code section 364.22(5)(*b*) that requires us to hold that the Davenport ATE ordinance is preempted. There is simply no provision in the Davenport ATE ordinance that alters the requirement that the City prove, by a clear, satisfactory, and convincing preponderance of evidence, that the defendant was the registered owner of the vehicle photographed violating the ATE ordinance. Seymour may not like the substance of the ordinance, which potentially imposes vicarious liability for traffic violations upon registered owners, but such a substantive challenge is irrelevant to the narrow question at hand,

---

[2]The Davenport ordinance creates civil penalties and, as a result, the "clear, satisfactory, and convincing" standard of Iowa Code section 364.22(5)(*b*) is not inconsistent with the reasonable doubt standard established in our case law for criminal violations. *City of Des Moines v. Rosenberg*, 243 Iowa 262, 272–73, 51 N.W.2d 450, 456 (1952).

namely, whether the Davenport ATE ordinance is inconsistent with state law.

The remaining question is whether the traffic regulations and enforcement mechanisms of Iowa Code chapter 321 are designed to preempt the field in a fashion that prohibits municipalities from enacting supplementary traffic enforcement ordinances such as the Davenport ATE ordinance. The legislative language related to uniform enforcement of traffic laws in Iowa Code section 321.235 suggests that field preemption may be at work. In addition, the length, breadth, and comprehensiveness of Iowa Code chapter 321 offers support for the application of field preemption to the Davenport ATE ordinance.

Yet, the introductory language in Iowa Code section 321.235 regarding uniformity must be read in tandem with the subsequent language expressly vesting power in municipalities to enact additional traffic regulations that are not "inconsistent" with Iowa Code chapter 321. This subsequent language eliminates any basis for field preemption because the legislature has expressly authorized municipalities to enact local ordinances regarding the subject matter—namely, traffic regulations—that are "not inconsistent with" the Code. Indeed, when it comes to traffic regulations, the legislature has expressly declined to preempt the field, so long as conflicts are not present. Iowa Code § 321.235; *see, e.g., Big Creek Lumber Co. v. County of Santa Cruz*, 136 P.3d 821, 833 (Cal. 2006) (finding that general legislative statements of intent to establish comprehensive regulation do not preempt field where statute also expressly authorizes local action); *Dep't of Licenses & Inspections, Bd. of License & Inspection Review v. Weber*, 147 A.2d 326, 328 (Pa. 1959) (holding legislative language allowing municipality to adopt appropriate ordinances not inconsistent with act demonstrates

lack of field preemption); *Brown v. City of Yakima*, 807 P.2d 353, 355 (Wash. 1991) (noting where statute expressly confers some measure of concurrent jurisdiction, field preemption does not apply).

Although not articulated as such by the parties, we believe the nub of both the conflict and field preemption issues is whether the doctrine of *expressio unius est exclusio alterius* applies to defeat the Davenport ATE ordinance. Under this rule of statutory interpretation, a provision that a statutory mandate be carried out in one way implies a prohibition against doing it another way. *See* Norman J. Singer, *Statutes and Statutory Construction* ch. 46 (6th ed. 2000). Arguably, by providing a criminal penalty for speeding and red light violations, the legislature should be deemed to have rejected alternate remedies such as civil penalties.

The issue here, however, is not whether the state legislature has authorized *state* authorities to establish an ATE system to enforce red light and speeding laws. This case involves the materially different question of whether state law prohibits *municipal* authorities from creating such a system. Unless the long-deceased Dillon Rule is resurrected, the notion that the mere failure of the legislature to authorize invalidates municipal action is without merit. Under our case law, the state statute and the municipal action must be *irreconcilable*. The fact that state law does not authorize the state to enforce its statute through certain remedial options does not mean that it forbids municipalities from the same course of action. In the context of state-local preemption, the silence of the legislature is not prohibitory but permissive. *See Cameron v. City of Waco*, 8 S.W.2d 249, 254 (Tex. Civ. App. 1928) (holding that rule of *expressio unius est exclusio alterius* does not apply in determining scope of municipal powers under home rule).

We recognize that the Colorado and Minnesota Supreme Courts have held that automated traffic enforcement regimes were preempted by state traffic laws. *City of Commerce City v. State*, 40 P.3d 1273, 1285 (Colo. 2002); *State v. Kuhlman*, 729 N.W.2d 577, 584 (Minn. 2007). On the other hand, the Supreme Court of Ohio has reached an opposite conclusion. *Mendenhall v. City of Akron*, 881 N.E.2d 255, 265 (Ohio 2008). We have reviewed the Colorado and Minnesota cases and find nothing to dissuade us from our approach, which is dictated by well-established Iowa case law.

In reaching our conclusion, we are aware that the desirability of ATE ordinances is the subject of contentious political debate. *See generally* Robin Miller, *Automated Traffic Enforcement Systems*, 26 A.L.R.6th 179 (2007). Supporters of ATE ordinances may passionately assert that the presence of the cameras and speed sensors promote public safety and save lives, especially the lives of children, when careless driving and road rage are all too common. In contrast, opponents may view ATE ordinances as unduly intrusive, unfair, and simply amounting to sophisticated speed traps designed to raise funds for cash-strapped municipalities by ensnaring unsuspecting car owners in a municipal bureaucracy under circumstances where most busy people find it preferable to shut up and pay rather than scream and fight.

As we have previously stated, "In construing statutes it is our duty to determine legislative intent; the wisdom of the legislation is not our concern." *Hines v. Ill. Cent. Gulf R.R.*, 330 N.W.2d 284, 289 (Iowa 1983). As a result, the pros and cons of ATE ordinances have no bearing on the narrow legal issue that we are required to decide in this case. Our only task is to determine, under established legal principles, the issues that

the parties have presented, specifically, whether the Davenport ATE ordinance is preempted by the traffic regulatory and enforcement provisions of Iowa Code chapter 321 and sections 364.22(5)(*b*), 805.6, or 805.8A. In light of the established cases and the enabling language of Iowa Code chapter 321.235, we hold that the doctrine of preemption does not apply. Any determination on the merits of the policy arguments is not for the court, but the political organs of government influenced by an informed electorate.

We also recognize that a number of statutory and constitutional questions have been raised to ATE ordinances that are not presented in this appeal. ATE ordinances have been attacked as amounting to an unlawful revenue raising measure or as improperly delegating government authority to a private vendor. Andrew W. J. Tarr, *Picture It: Red Light Cameras Abide by the Law of the Land*, 80 N.C. L. Rev. 1879, 1886 (2002) (issue of unlawful revenue raising); *see also Leonte v. ACS State & Local Solutions, Inc.*, 19 Cal. Rptr. 3d 879 (Ct. App. 2004) (delegation of power). Academic commentators have debated whether ATE ordinances violate rights of privacy. *See, e.g.*, Quentin Burrows, *Scowl Because You're on Candid Camera: Privacy and Video Surveillance*, 31 Val. U. L. Rev. 1079 (1997); Mary Lehman, *Are Red Light Cameras Snapping Privacy Rights?*, 33 U. Tol. L. Rev. 815 (2002); Steven Tafoya Naumchik, *Stop! Photographic Enforcement of Red Lights*, 30 McGeorge L. Rev. 833 (1999). ATE ordinances also have been attacked on due process, Fourth Amendment, and equal protection grounds. *See, e.g.*, *McNeill v. Town of Paradise Valley*, 44 Fed. App'x 871 (9th Cir. 2002) (Fourth Amendment); *Shavitz v. City of High Point*, 270 F. Supp. 2d 702 (M.D.N.C. 2003), *vacated on other grounds sub nom. Shavitz v. Guilford*

*County Bd. of Educ.*, 100 Fed. App'x 146 (4th Cir. 2004) (equal protection); *Agomo v. Fenty*, 916 A.2d 181 (D.C. 2007) (due process).

All of the above questions are not raised in this appeal, and we consequently express no view on them. This court is not a roving commission that offers instinctual legal reactions to interesting issues that have not been raised or briefed by the parties and for which the record is often entirely inadequate if not completely barren. We decide only the concrete issues that were presented, litigated, and preserved in this case.

## IV. Conclusion.

We hold the Davenport ATE ordinance is not preempted by the traffic regulations and enforcement mechanisms of Iowa Code chapter 321 and sections 364.22(5)(*b*), 805.6, or 805.8A. As a result, the ruling of the district court in this matter is affirmed.

**AFFIRMED.**

All justices concur except Wiggins, J., who dissents and Baker, J., who takes no part.

**WIGGINS, Justice (dissenting).**

I dissent. I cannot agree with the majority's conclusion that the legislature's comprehensive enactment of the traffic regulations and enforcement mechanisms contained in chapter 321 of the Iowa Code does not preempt Davenport's Automated Traffic Enforcement ordinance. Although the majority recognizes the doctrine of implied preemption, it fails to follow our existing case law in its application of the doctrine.

Chapter 321 includes a uniform law provision. Iowa Code § 321.235 (2007). This provision provides:

> The provisions of this chapter shall be applicable and uniform throughout this state and in all political subdivisions and municipalities therein and no local authority shall enact or enforce any rule or regulation in conflict with the provisions of this chapter unless expressly authorized herein. Local authorities may, however, adopt additional traffic regulations which are not in conflict with the provisions of this chapter.

*Id.*

Chapter 321 also limits the power of local authorities to enact an ordinance that conflicts with the Code. *Id.* § 321.236. It states in relevant part:

> Local authorities shall have no power to enact, enforce, or maintain any ordinance, rule or regulation in any way in conflict with, contrary to or inconsistent with the provisions of this chapter, and no such ordinance, rule or regulation of said local authorities heretofore or hereafter enacted shall have any force or effect . . . .

*Id.* Although section 321.236 enumerates specific areas where a local municipality may regulate, it does not include automatic enforcement ordinances.

This court has applied these sections on two prior occasions and struck down local ordinances that were inconsistent with chapter 321.

*Central City v. Eddy*, 173 N.W.2d 582, 583–84 (Iowa 1970); *City of Vinton v. Engledow*, 258 Iowa 861, 868, 140 N.W.2d 857, 862 (1966). In *City of Vinton*, the city enacted a local ordinance defining reckless driving as:

> "Every driver of any vehicle upon any street in the city shall drive and operate such vehicle in a careful and prudent manner and with due regard and precaution for the safety of pedestrians, persons, property and other vehicles. No person shall operate or drive any vehicle in a manner or at a speed greater or other than is reasonable and safe with respect to such vehicles, persons, pedestrians or property."

*City of Vinton*, 258 Iowa at 864, 140 N.W.2d at 860 (citation omitted). Although a prior state statute defined reckless driving in this manner, the present state statute only allowed a finding of reckless driving when "[a]ny person [ ]drives any vehicle in such manner as to indicate either a willful or a wanton disregard for the safety of persons or property . . . ." *Id.* at 865, 140 N.W.2d at 860.

There this court recognized the state of mind of the violator for committing the offense of reckless driving was lower under the city ordinance than the state statute. The city ordinance only required a finding of negligence to hold the driver culpable, while the state ordinance required a finding of "either a willful or a wanton disregard for the safety of persons or property." *Id.* In analyzing the city ordinance, the court first determined that this type of regulation was not contained as an exception to section 321.236. *Id.* at 865–66, 140 N.W.2d at 860–61.

Next, the court considered whether the city ordinance was consistent with the state statute, as required by section 321.235. The test set out by our court to determine whether a statute is valid under sections 321.235 and 321.236 is that "[a] city ordinance cannot be allowed to change the statutory definition either by enlargement or

diminution." *Id.* at 866, 140 N.W.2d at 861. The court went on to say, " '[T]he test of the validity of a statute or ordinance is not what has been done under it but what may be done by its authority.' " *Id.* (quoting *Chicago, Rock Island & Pac. R.R. v. Liddle*, 253 Iowa 402, 409, 112 N.W.2d 852, 856 (1962)).

In applying these principles, the court found the difference between the state of mind needed to hold violators liable under the state and city laws destroyed the uniformity required by sections 321.235 and 321.236. *Id.* The state of mind needed for holding a person culpable for reckless driving is a matter of legislative policy. *Id.* Because the laws in Vinton were not consistent with the rules of the road enforceable in other parts of the state, this court held the Vinton ordinance invalid. *Id.*

In 1970 the court was asked to revisit a similar issue. *Central City*, 173 N.W.2d at 583–85. There the city held drivers culpable for careless or negligent driving on public streets, alleys, and highways. *Id.* at 583. Our court recognized that the legislature only held a driver culpable for driving with either a willful or a wanton disregard for the safety of persons or property. *Id.* at 584. Thus, the city's ordinance holding a driver culpable for negligent driving was inconsistent with state law. *Id.* Accordingly, the ordinance was invalid. *Id.*

Applying established law to the facts of this case can only lead to one conclusion—Davenport's Automated Traffic Enforcement ordinance violates sections 321.235 and 321.236. No one argues the ordinance is allowed under an enumerated exception to section 321.236. Thus, we must determine whether the Davenport ordinance is inconsistent with chapter 321.

The legislature has defined when an owner of a vehicle may be culpable for a violation of chapter 321. Iowa Code § 321.484. Under

chapter 321, an owner can only be culpable for a driver's moving violation if the owner of any vehicle requires, or knowingly permits the operation of such vehicle upon a highway in any manner contrary to the law. *Id.* Under Davenport's ordinance, an owner is strictly liable for the actions of a person driving the owner's vehicle. By requiring a lesser state of mind for an owner to be culpable of the same offense, the Davenport ordinance is inconsistent with the stated legislative policy regarding the culpability of owners under chapter 321.

It may be asserted that because the violation of the ordinance is a civil infraction, it is not inconsistent with chapter 321. I cannot agree with this premise.

In Illinois several municipalities passed local ordinances allowing traffic offenders to pay a civil settlement fee in lieu of court adjudication. *People ex rel. Ryan v. Vill. of Hanover Park,* 724 N.E.2d 132, 135 (Ill. App. Ct. 1999). Like Davenport's ordinance, a traffic violator in these municipalities would pay a fine to the municipality and the violation would not be reported to the state. Section 11-207, chapter 11 of the Illinois Code contains the same language as section 321.235 of the Iowa Code. *Id.* at 139.

The Illinois Appellate Court found this statute violated the uniformity requirement of traffic laws contained in section 11-207 of chapter 11 for two reasons. *Id.* at 143–44. First, the ordinance allows certain moving violations to be adjudicated administratively, while the Illinois Code requires moving violations to be dealt with judicially. *Id.* at 140. Second, by not reporting the violations to the licensing authority, the licensing authority cannot exercise its exclusive authority to cancel, suspend, or revoke a license. *Id.* at 141. I agree with the reasoning of the Illinois court.

The Iowa legislature has given Iowa municipalities the power to adjudicate parking violations administratively. Iowa Code § 321.236(1). The legislature has not given municipalities the authority to adjudicate other violations of our traffic code administratively. The judicial system must adjudicate all other violations. When law enforcement cites a person for a moving violation, the officer must arrest the violator or issue a citation. *Id.* §§ 805.1, 805.6. Court intervention is necessary so the violator cannot pay a civil settlement fee in exchange for "an opportunity to circumvent the potential consequences of committing the offense, namely, a chance to avoid an adjudication [by the court], a finding of guilty, and a guilty finding being reported to the [licensing authority]." *People ex rel. Ryan,* 724 N.E.2d at 140. Consequently, for the Davenport ordinance to be valid, it must treat its violators as the legislature treats violators in other parts of the state. The ordinance can only achieve the uniformity required by section 321.235 by adjudicating these moving violations judicially.

Another problem with the administrative adjudication under the Davenport ordinance is its failure to report violators to the department of transportation (DOT). The DOT is the sole agency designated by the legislature to administer the issuance, suspension, and revocation of a driver's license. Iowa Code § 321.2. In carrying out these duties, the DOT has instituted various rules regarding the suspension and revocation of a license. Iowa Admin. Code r. 761—615. The action the agency takes is dependent on the nature of the violation. *See, e.g., id.* r. 761—615.9 (providing for suspension of habitual offenders). The DOT has also developed driver improvement programs as an alternative to license suspension. *Id.* r. 761—615.43.

In order for the DOT to administer the suspension or revocation of a driver's license, it must receive a record of the conviction from the court system. Chapter 321 requires the court to advise the DOT of a conviction. Iowa Code § 321.491. The Davenport ordinance does not. The legislative intent behind the enactment of traffic laws is to keep the streets and highways of this state safe. One of the most effective means of doing that is to reeducate drivers who violate the laws through driver improvement programs. If a driver cannot be reeducated, then the DOT has the ability to suspend or revoke a license. For this legislative scheme to work, the DOT needs to have exclusive control over the administration, suspension, and revocation of drivers' licenses so the consequences of committing a violation of chapter 321 remain uniform throughout the state.

The Davenport ordinance circumvents the DOT's exclusive control, and undermines the goal set forth by the legislature that repeat offenders should be kept off our roads. Why would the legislature allow a person with five violations under the Davenport ordinance to continue to drive, when its stated legislative policy is to prohibit a driver with three moving violations in any other part of the state from operating a motor vehicle? An unsafe driver in Davenport is an unsafe driver anywhere else in this state. By not applying our suspension and revocation laws uniformly, our streets and highways become a more dangerous place.

I understand Davenport's desire to decrease the occurrences of speeding without the expense of adding more officers for enforcement in these tough economic times. I also understand the city's need to raise revenue from new sources. However, I cannot believe an ordinance that holds the owner strictly liable and does nothing to remove repeat offenders from the road furthers the legislative intent of sections 321.235

and 321.236. Sections 321.235 and 321.236 require the uniform applicability of chapter 321 and prohibit municipalities from enacting or enforcing any rule or regulation in conflict with the provisions of chapter 321 unless expressly authorized by the legislature. The uniformity of our traffic laws keeps the roads safe for all Iowans. The legislature never envisioned that municipalities could raise revenue under the guise of traffic law enforcement at the expense of safer highways.

Accordingly, without specific authorization by the legislature to hold owners strictly liable for the acts of a driver, without judicial adjudication, and without DOT authority to regulate who should not be on the roads, I would hold Davenport's Automated Traffic Enforcement ordinance invalid.