# IN THE COURT OF APPEALS OF IOWA

No. 23-0954
Filed September 13, 2023

**IN THE INTEREST OF K.B.-S. and J.B.,**
**Minor Children,**

**L.B., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Cynthia S. Finley, District Associate Judge.


        The mother appeals the termination of her parental rights to two of her children. **REVERSED.**


        Deborah M. Skelton, Walford, for appellant mother.

        Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

        Annette F. Martin, Cedar Rapids, attorney and guardian ad litem for minor children.


        Considered by Badding, P.J., Buller, J., and Potterfield, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**POTTERFIELD, Senior Judge.**

The mother appeals the termination of her parental rights to two of her children,[1] K.B.-S. (born in 2016) and J.B. (born in 2019).[2] She argues the State failed to prove the statutory grounds for termination and the loss of her rights is not in the children's best interests due to the parent-child bonds. In the alternative, she requests more time to work toward reunification.

**I. Background Facts and Proceedings.**

In early 2020, the mother—who has been diagnosed with depression, anxiety, bipolar disorder, borderline personality disorder, and ADHD—was struggling with her mental health. She sought help with parenting from the children's maternal grandfather and his significant other, Vicki; K.B.-S and J.B. were placed in their care under a formal guardianship.

In July, the guardianship court expressed several concerns about the guardianship, including whether the grandfather and Vicki were "on the same page." The court filed an order directing the Iowa Department of Health and Human Services to investigate whether a child-in-need-of-assistance (CINA) petition was needed. The department completed an assessment and concluded a CINA petition was not warranted, noting that while the grandfather and Vicki were ending their romantic relationship, they intended to work together to continue caring for K.B.-S and J.B.

---

[1] The mother gave birth to a third child in December 2022; that child was not part of the termination proceedings and is not at issue here.
[2] The fathers' rights were also terminated. No father appeals.

In February 2021, the guardianship court asked the department to evaluate again whether a CINA proceeding should be initiated. At that time, Vicki expressed that she was willing to continue caring for J.B. and K.B.-S but did not want to retain legal custody of the children. And the grandfather, who was no longer living with Vicki, was not able to take over the physical care of the children due to his work schedule. The State filed CINA petitions for both children.

The children were adjudicated CINA and, in May, the department was ordered to take over legal custody of them.[3] The children remained in Vicki's care.

During roughly the first year the children were in the department's custody, the mother struggled with her mental health and the use of illegal substances, including methamphetamine. The mother expressed some suicidal ideation—not for the first time[4]—and was hospitalized at least once. As she later admitted, the mother did not consistently take her mental-health medications as prescribed during this period. She did, however, regularly attend scheduled visits with the children, took advantage of "extra" visits that family members supervised, and had frequent phone calls with the children. And she maintained the same housing she had since the children lived with her before the voluntary guardianship.

In the department's May 2022 report to the court (leading up to the permanency hearing), the social worker opined that the mother was "strugg[ling] with the current placement the children . . . due to Vicki not wanting to share

---

[3] Apparently the guardianship was dissolved when the juvenile court became involved with the mother and children.

[4] During a mental-health evaluation in August 2022, the mother reported "five to ten suicide attempts over the course of her life, the most recent of which was [in] November" 2021. She also reported multiple hospitalizations for mental-health concerns over the course of her lifetime.

information about the children's medical, play, therapy, dental, school, and recreational activities (dance)." Following a hearing soon after, the children were removed from Vicki's care and placed with a foster family.[5]

By August 2022, the mother showed significant progress. She was participating in outside services, including a community-based mental-health service and met with the staff consistently. She was compliant with her mental-health medication and, in a letter to the court, the program director noted the mother "appear[ed] to be stable in functioning" and had not had any hospital stays or psychiatric hospitalizations in 2022. The mother worked at a local fast food restaurant thirty to thirty-five hours each week.[6] She was engaged with a mental-health therapist who was also a certified substance-abuse counselor. And she participated in Narcotics Anonymous meetings. However, the mother continued to have some drug tests that were positive for methamphetamine in spite of her claimed sobriety date of March 29, 2022.[7]

---

[5] In the termination order, the court explained the need for this change as a result of the fact "[i]t had become apparent . . . that the placement of the children, [Vicki], was impeding reunification efforts."

[6] On August 10, the general manager of the store wrote an email in support of the mother, calling her "nothing short of an amazing staff member!" and explaining that the mother was being trained to be a "person in charge" at the restaurant. The manager explained that since the mother was hired in April,

> she's shown up to every shift, covered multiple shifts when needed, worked 12 hour days and had a good attitude and smile on her face the whole time. I can't say what she's like outside of work, but while she's here she is very responsible and independent. We at Jimmy Johns would trust her with the store and hope to add to her list of [duties] soon.

[7] Even at the time of the termination trial, which took place over three dates in March and April 2023, the mother maintained her last use of methamphetamine or cocaine was March 29, 2022, and all later positive tests were due to exposure rather than ingestion.

Based on the results from drug tests, in which the mother consistently participated, the mother maintained sobriety from August 3, 2022 until October 25, 2022. And because of these months of sobriety, her visits were changed to semi-supervised. The change only lasted for about a month—until the mother provided a urine test that was positive for cocaine and a sweat test that was positive for methamphetamine—at which point they returned to fully supervised.

The mother gave birth to her third child in December 2022. He was removed from her custody at his birth and placed in the care of the maternal grandmother; the mother was allowed to move in with the maternal grandmother to be near and help provide care for the child. And in early January 2023, the mother's visits with K.B.-S. and J.B. were again changed to semi-supervised after she went about six weeks without a positive drug test.[8]

The reduced supervision lasted only about two weeks. In mid-January, the mother's boyfriend—who is also the biological father of her third child—was released from incarceration. On January 13, the mother called the social worker and reported the boyfriend stole her house key and was in her home; he told the mother he would "beat the wheels off her." The worker told the mother what she needed to do keep herself and the child safe, and the mother was told that the boyfriend was not allowed to have interactions with the third child because he had not yet communicated with the department and needed to get at least his first visits scheduled with a provider—not the maternal grandmother who was supervising the mother's time with the third child. A few days later, the worker learned that the

---

[8] The mother's last positive drug test was on November 17, 2022.

mother, maternal grandmother, and third child stayed overnight in the mother's apartment and the mother allowed the boyfriend to stay there too. The grandmother reported what happened and explained that she had tried to convince the mother not to let the boyfriend come over; she did not want to be put in the middle of the mother's life choices. In contrast, the mother repeatedly denied that the boyfriend stayed over, reported that the initial threats from the boyfriend were not serious, and indicated she intended to remain in a relationship with him. After this, the mother's visits reverted to fully supervised and she was no longer allowed to live in the maternal grandmother's home with the third child. The boyfriend moved in with the mother.

From the change in visitation in January through the last date of the termination trial visits remained fully supervised. Following the termination trial on March 31, April 14, and April 28, 2023, the juvenile court terminated the mother's parental rights to K.B.-S under Iowa Code section 232.116(1)(f) (2022) and to J.B. under section 232.116(1)(h).

The mother appeals.

**II. Standard of Review.**

We review termination decisions de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). We respect the juvenile court's factual findings, especially as to witness credibility, but they do not dictate our result. *In re M.D.*, 921 N.W.2d 229, 232 (Iowa 2018).

**III. Discussion.**

We only find it necessary to address the mother's final issue—her request for more time.[9]  *See, e.g.*, *In re K.R.*, No. 19-0090, 2019 WL 1486612, at *1 (Iowa Ct. App. Apr. 3, 2019) (declining to consider the section 232.116 three-step analysis for termination of parental rights when the court determined an extension of time was appropriate); *In re R.M.*, No. 12-1886, 2013 WL 264326, at *1 (Iowa Ct. App. Jan. 24, 2013) (same).

To begin, we recognize that the children have been out of the mother's care since early 2020—a period of more than three years.  But we do not think three years is the proper time frame for analyzing this case.  The mother reached out to family for help when she was struggling with her mental health, and the children were part of a voluntary guardianship in 2020.  During this time, the children were not adjudicated CINA, and the mother was not receiving court-ordered services.  *Cf. In re L.B.*, 970 N.W.2d 311, 314 (Iowa 2022) (requiring a CINA adjudication in the current case to allow for termination under paragraph (f)).  A parent should not be penalized for recognizing they need help and taking affirmative steps to ensure their children are receiving safe and proper care, and counting the first year against the mother would do just that.

---

[9] Though we choose to give the mother the benefit of the doubt and address this issue, we note that it was buried within her statement of material facts rather than set out as a separate issue.  *See In re J.M.*, No. 21-1058, 2021 WL 4304660, at *1 (Iowa Ct. Sept. 22, 2021) (addressing the substance of the father's claims on appeal after giving him "the benefit of the doubt" on the issues presented); *accord In re N.M.*, No. 20-0882, 2020 WL 5651602, at *1 n.2 (Iowa Ct. App. Sept. 23, 2020).  In the future, we urge parties to be more clear with the issues presented in their petitions on appeal so that meritorious claims like this one are not overlooked.

Here, the department and juvenile court became involved in May 2021. But we also question whether this is the correct date from which to start the count. From May 2021 until May 2022, the children were placed with Vicki. The court ultimately removed the children from Vicki's care after determining she was impeding reunification efforts. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) (recognizing the department's obligation to make reasonable efforts toward reunification); *accord id.* (requiring the State to show reasonable efforts "as a part of its ultimate proof the child cannot be safely returned to the care of a parent" because "the scope of the efforts by the [department] to reunify parent and child after removal impacts the burden of proving those elements of termination which require reunification efforts").

So we focus on the period from May 2022 through the termination trial, which was completed on April 28, 2023. The mother maintained sobriety from November 17, 2022 through the end of the termination trial in April 2023—a period of more than six months.[10] And throughout the nearly year-long window we are most focused on, the mother was compliant with her mental-health medications and continued participating in therapy. Reports from the department praise the mother for taking a proactive approach to her mental health, which included having a plan in place for after giving birth to prepare for possible postpartum struggles.[11]

---

[10] And before two positive drug tests in relatively quick succession, the mother was sober for about two and a half months (from August 8 until October 25, 2022).

[11] Much was made of an errant comment from the mother in the lead-up to the termination trial about jumping off a bridge. The mother has a history of serious mental-health struggles, which includes a number of suicide attempts, and we understand why the comment prompted immediate concern. But a professional evaluated the mother and concluded she was not suicidal or in need of additional

And visits between the mother and children consistently went well. For example, the report filed after a solution focused meeting in mid-December 2022 relayed that the service provider who supervised the mother's visits offered that the mother "show[s] so much positive parenting" and that he had taken some of the mother's parenting tools and shared them with other families for whom he supervised visits. And the department's March 2023 report to the court included the following, "[The mother] is very attentive when visits take place. She is very engaged during the visits with the children. She has age appropriate expectations for both [children]. She is very loving and provides for all their needs during the visits."

We recognize the mother's history as both a victim and perpetrator of domestic violence, and we do not minimize the concern that arose when the mother reported her boyfriend threatened her physical safety in January 2023. But no physical violence between the mother and boyfriend have been reported, and reports summarizing visits where both the mother and boyfriend are present do not reflect any aggression or violence between the two. Insofar as this is an ongoing concern of the department and the court, the mother should be required to participate in therapy or other services to address the issue—we have found

---

help. In fact, at the termination trial, the professional testified that he was not concerned for the mother, stating:

> We've talked about everything. We've planned it. She's been stable, umm, like, for a long period of time. She's learned her coping skills. She does a great job with them. . . . I mean, I think she's been very honest with her emotions and her mental health. There's been no concerns with her lying to us about anything. She's been very straightforward.

We credit the testimony of the professional and do not view the mother's comment—apparently made out of frustration and during a high-stress moment—to be a portent of her mental health.

nothing in the record before us requiring her to do so. Similarly, the termination order references "[the mother's] frequent gambling and lack of impulse control." This alleged issue seems to stem from the guardian ad litem's March 2023 report and appears to be a tack on by the juvenile court; while it is possible the mother has an issue with gambling, the record is devoid of any reference to it until March 14, 2023 (about two weeks before the first day of the termination trial) and the mother was never ordered to take any steps to address it.[12] Meanwhile, the mother maintained the same home for years and was always prepared for visits with food and other necessary items.

We reverse the termination of the mother's parental rights to K.B.-S. and J.B. and give her six more months to work toward reunification. *See* Iowa Code § 232.104(2)(b). With this extra time, the mother will be able to evince her long-term commitment to her sobriety and mental health. If there are ongoing concerns about the mother's romantic relationship or issues with gambling, the department must expressly outline what the mother needs to do to alleviate those concerns.

**REVERSED.**

Badding, P.J., concurs; Buller, J., dissents.

---

[12] The report states: "It is also reported [the mother] and [the boyfriend] are heavy gamblers."

**BULLER, Judge.** (dissenting)

In my view, the majority opinion decides an issue that was not briefed and reverses an alleged error that was not preserved. Because I would not reach the question the majority opinion finds dispositive, I dissent.

The only place the mother's petition on appeal arguably urges that she deserved an additional six months to work toward reunification is in the facts section. In the final sentence of the facts, the mother "respectfully requests that the Court reverse the juvenile court order terminating her parental rights with respect to K.B.-S. and J.B., and that she be granted additional time to work toward reunification." The additional-time issue is not listed as a brief point and is never mentioned in the "legal issues" section of the petition. No case law or other legal authority supporting the additional-time claim appears anywhere in the petition, nor does any legal or factual argument supporting it. In short, this issue is not raised in any meaningful way.

The State did not address the additional-time claim in its response to the petition on appeal, and I understand why. The State reasonably relied on case law from both the supreme court and this court. "[R]andom mention of [an] issue, without elaboration or supportive authority, is insufficient to raise the issue for our consideration." *Soo Line R.R. v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 691 (Iowa 1994); *accord Midwest Auto. III, LLC v. Iowa Dep't of Transp.*, 646 N.W.2d 417, 431 n.2 (Iowa 2002); *State v. Mann*, 602 N.W.2d 785, 788 n.1 (Iowa 1999). In our own unpublished termination cases, we have recognized that "passing mention" of a claim is insufficient to warrant review. *See, e.g.*, *In re M.G.*, 18-0650, 2018 WL 3912192, at *2 (Iowa Ct. App. Aug. 15, 2018); *In re R.N.*, No. 13-0743, 2013 WL

3864550, at *3 (Iowa Ct. App. Jul. 24, 2013). We have also correctly recognized that, even in termination cases, "one sentence that cites no authority" is insufficient to invoke appellate review. *In re P.R.*, No. 19-1182, 2019 WL 4302141, at *2 (Iowa Ct. App. Sept. 11, 2019). As one of my colleagues put it, we see a fair number of cases where juvenile litigants "sprinkle references to other issues throughout [their] petition on appeal," and this sprinkling waives claims. *In re B.D.*, No. 23-0105, 2023 WL 2671958, at *1 (Iowa Ct. App. Mar. 23, 2023). I cannot fault the State for declining to brief an issue that was never adequately raised by the appellant.

To a limited extent, I appreciate the majority opinion's inclination to "give the mother the benefit of the doubt," given the expedited deadlines for juvenile appeals and the high stakes. But our waiver case law does not judge by one standard for criminal and ordinary civil appeals and another for juvenile cases. And in any event, we could not craft such case law: the rules promulgated by the supreme court for juvenile appeals require clear statements of legal issues, set off by numbered sections, with "supporting legal authority" for each claim. Iowa Rs. App. P. 6.201(d), 6.1401–Form 5, ¶ 8. I do not believe the "benefit of the doubt" authorizes us to assume the role of a litigant and advance claims in the absence of adversarial presentation. *See Inghram v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239, 240 (Iowa 1974) ("To reach the merits of this case would require us to assume a partisan role and undertake the appellant's research and advocacy. This role is one we refuse to assume."). And I fear this leads us down the dangerous road of advancing arguments that might have been made, imperiling our court's role as neutral arbiter. *See Hyler v. Garner*, 548 N.W.2d 864, 876 (1996) ("[W]e will not

speculate on the arguments [a party] might have made and then search for legal authority and comb the record for facts to support such arguments.").

In addition to my concerns about deciding an unbriefed issue, I question whether the claim was adequately preserved. Because the majority opinion decided this issue without the benefit of adversarial briefing (and a likely challenge to error preservation by the State), I conducted my own analysis of the record. The mother's attorney never urged, in pleadings or at any point in the transcript, that the mother was requesting an additional six months. The only arguable place where the juvenile court ruled on the issue is the following conclusion sentence: "The Court finds that clear and convincing evidence has been presented to show that the children cannot be returned to the care of a parent now or in a reasonable period of time for the reasons discussed above." It strains credulity to believe this opaque sentence decides a claim never put before the court. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Because the issue was never litigated on appeal or below, I am left wondering not only what legal arguments the State might have made, but also what evidence the State might have offered. This unfairness and the resulting incomplete record go to the heart of the purposes animating our error-preservation rules. *See State v. Crawford*, 972 N.W.2d 189, 199 (Iowa 2022) (summarizing rationales for error-preservation rules, including that they ensure an adequate record for appellate review and disallowing sandbagging). I believe the majority opinion errs in reaching this unpreserved question.

Finally, to the extent I am able to evaluate the merits of an argument for additional time, I would deny the request. While I commend the mother's efforts to address her parenting, the fact remains that the children have been out of her care for more than three years at this point. The children deserve permanency. *See In re C.K.*, 558 N.W.2d 170, 175 (Iowa 1997). The mother continues to have issues with mental health, substance abuse, and domestic violence. I cannot conclude the mother will likely be able to care for the children after an additional six months. *See In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) ("[T]he juvenile court may deny termination and give the parent an additional six months for reunification *only if* the need for removal 'will no longer exist at the end of the additional six-month period.'" (emphasis added) (quoting Iowa Code § 232.104(2)(b) (2021))).

Even if I viewed the merits differently, I do not believe we can or should overlook the deficiencies in the record and arguments before us. "This court is not a roving commission that offers instinctual legal reactions to interesting issues that have not been raised or briefed by the parties and for which the record is often entirely inadequate if not completely barren." *City of Davenport v. Seymour*, 755 N.W.2d 533, 545 (Iowa 2008). "We decide only the concrete issues that were presented, litigated, and preserved in this case." *Id.* I believe the majority opinion decides an issue that was not presented, litigated, or preserved. I therefore dissent.