# IN THE SUPREME COURT OF IOWA

No. 10–0898

Filed July 27, 2012

**MALL REAL ESTATE, L.L.C.,**
an Iowa Limited Liability Company,

    Appellant,

vs.

**CITY OF HAMBURG,** an Iowa
Municipal Corporation,

    Appellee.

Appeal from the Iowa District Court for Fremont County, Greg W. Steensland, Judge.

An establishment appeals an order denying its request for an injunction enjoining a city from enforcing an ordinance regulating nude dancing. **REVERSED AND REMANDED WITH INSTRUCTIONS.**

W. Andrew McCullough, Midvale, Utah, and Brian B. Vakulskas and Daniel P. Vakulskas of Vakulskas Law Firm, Sioux City, for appellant.

Raymond R. Aranza of Scheldrup Blades Schrock Smith Aranza, P.C., Cedar Rapids, for appellee.

**WIGGINS, Justice**.

The operator of an establishment offering nude and seminude dance performances sought an injunction restraining a city from enforcing its ordinance regulating nude and seminude dancing. The district court found that state law did not preempt the ordinance and that the ordinance was constitutional. On appeal, we find that state law preempts enforcement of the ordinance and that it is unenforceable against the establishment. Accordingly, we reverse the judgment of the district court and remand the case with instructions to the court to enter an order enjoining the city from enforcing its ordinance against the establishment.

## I. Background Facts and Proceedings.

On December 8, 2008, the Hamburg city council passed chapter 48 of its city code. The ordinance, known as the "Sexually Oriented Business Ordinance," contains provisions relating to licensing and zoning and imposes a range of regulations upon sexually oriented businesses. The stated purpose of the ordinance is to "regulate sexually oriented businesses in order to promote the health, safety, morals, and general welfare of the citizens of the *City*, and to establish reasonable and uniform regulations to prevent the deleterious secondary effects of sexually oriented businesses." Hamburg, Iowa, Code § 48.010.01 (Dec. 8, 2008). The ordinance also states, "[I]t is neither the intent nor effect of this ordinance to restrict or deny access by adults to sexually oriented materials protected by the First Amendment to the Constitution of the United States of America . . . ." *Id.*

Businesses subject to the terms of the ordinance include adult cabarets, which the ordinance defines, among other things, as any "business or entity that is with the emphasis on observation or viewing of

nude or semi-nude performances whether the performers receive compensation or not, that regularly features *persons* who appear nude or *semi-nude.*"[1]  *Id.* §§ 48.020.02, .030.  The ordinance requires a sexually oriented business to have a valid sexually oriented business license and an employee of a sexually oriented business to have a valid sexually oriented business employee license.  *Id.* § 48.040.01–.02.  Further, the ordinance regulates many aspects and activities of sexually oriented businesses, including the consumption of alcohol on the premises, exterior portions of the businesses, signage, hours of operation, the exhibition of sexually explicit films, live nudity, and siting.  *See id.* §§ 48.085–.087, .130–.150, .180, .200.

For example, the ordinance prohibits the possession or consumption of alcoholic beverages by any person on the premises of a sexually oriented business.  *Id.* § 48.085.  The ordinance also prohibits any person from intentionally or knowingly appearing in a state of nudity

---

[1]The ordinance also classifies adult bookstores, adult novelty stores, adult video stores, adult motels, adult motion pictures theaters, and seminude model studios as sexually oriented businesses.  Hamburg, Iowa, Code § 48.030 (Dec. 8, 2008).  Further, the ordinance defines "nudity or a state of nudity" as:

> The showing of the human male or female genitals, pubic area, vulva, anus, anal cleft, or cleavage with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any part of the nipple and areola.

*Id.* § 48.020.14.  Finally, the ordinance defines "semi-nude or state of semi-nudity" as:

> A state of dress in which opaque clothing covers no more than the genitals, anus, anal cleft, cleavage, pubic area, vulva, as well as the nipple and areola of the female breast, as well as portions of the body covered by supporting straps or devices.  This definition shall not include any portion of the cleavage of the human female breast exhibited by a dress, blouse, skirt, leotard, bathing suit, or other wearing apparel provided that the areola and nipple are not exposed in whole or in part.

*Id.* § 48.020.18.

or from intentionally or knowingly violating Iowa Code section 728.5.[2] *Id.* § 48.180.01. Similarly, the ordinance contains requirements that seminude employees remain more than six feet away from customers and on a stage at least two-feet high.[3] *Id.* § 48.180.02. It also prohibits the exchange of gratuities between customers and seminude employees and prohibits intentional contact between customers and seminude employees. *Id.* § 48.180.03, .04. Moreover, it restricts the size, number, and shape of a sexually oriented business's signage, places restrictions on the content of such signs, and regulates the font and color scheme of such signs. *Id.* § 48.087.

The City imputes violations of the ordinance to the sexually oriented business licensee. *Id.* § 48.190. If a sexually oriented business licensee violates the ordinance or knowingly allows an employee to violate the ordinance, then the City may suspend the license of the business and the employee. *Id.* § 48.090. The ordinance also provides for the revocation of a sexually oriented business license. For example, the City may revoke a sexually oriented business license for activity on the premises related to controlled substances, alcohol, prostitution, acts of specified sexual activity, conduct negatively affecting the health, safety, or welfare of the citizens of Hamburg, or conduct otherwise in violation of the ordinance. *Id.* § 48.100.

Clarence Judy and Terry Rutledge own Mall Real Estate. Mall Real Estate leases space located at 701 Main Street in Hamburg to the

---

[2]Iowa Code section 728.5 prohibits total nudity in places of business required to obtain a sales tax permit. Iowa Code § 728.5 (2009). The Eighth Circuit Court of Appeals held section 728.5 does not violate the First Amendment to the United States Constitution. *See Farkas v. Miller*, 151 F.3d 900, 905 (8th Cir. 1998).

[3]The ordinance's definition of "employee" includes performers. Hamburg, Iowa, Code § 48.020.11.

Hamburg Theatre for the Performing Arts, which has been open for nine years and is also known as Shotgun Geniez. Mall Real Estate operates the parking lots surrounding the Hamburg Theatre. Persons who wish to enter the Hamburg Theatre must pay an individual parking fee to Mall Real Estate. Performers at the Hamburg Theatre perform nude, seminude, and fully clothed. At times during performances, performers physically contact customers, often by sitting in their laps. The performers also spend time talking to customers. The Hamburg Theatre does not have a liquor license or sell alcohol, but it does allow customers to supply their own alcohol. Judy believes the customers at the Hamburg Theatre come to see nude dancing, get lap dances, and converse with the performers.

Judy testified the Hamburg Theatre does its best to ensure the customers and performers comply with the law. He further testified the Hamburg Theatre does its best to ensure minors do not enter. Hamburg Theatre employees have caught minors attempting to enter the club and turned them away. The Hamburg Theatre gives customers younger than twenty-one years old but older than eighteen years old a glow-in-the-dark wristband to signify they are not permitted to consume alcohol. Further, club employees keep watch to make sure no one with a wristband consumes alcohol. Performers must provide identification proving their age, but are otherwise free to perform in whatever manner they wish provided they comply with any applicable laws while in the Hamburg Theatre.

Judy estimates in excess of 112,000 customers have been to the Hamburg Theatre during the past nine years. The Hamburg Theatre has never been cited by police for unsightly litter, and no one in the club has been cited for engaging in sex acts on the premises or for purchasing or

selling drugs. However, on one occasion the police cited a minor as a minor in possession of alcohol at the club. In addition, a seventeen-year-old once danced on stage, but the Hamburg Theatre was acquitted of any wrongdoing. There was also one case of alleged prostitution, which was dismissed. Seven or eight incidents involving the club have resulted in police reports. In defense of the Hamburg Theatre, Judy constructed a list of all calls to police that had been made within 1000 feet of the business since 2002, noting that only a few actually pertained to the Hamburg Theatre.

Shortly after the City adopted the ordinance, Mall Real Estate filed a petition seeking a declaratory judgment declaring that the City's ordinance does not affect or apply to the Hamburg Theatre and that the ordinance is unconstitutional. Mall Real Estate further requested a temporary injunction restraining Hamburg from enforcing the ordinance against the Hamburg Theatre.

The district court denied Mall Real Estate's request for declaratory and injunctive relief, holding the ordinance affected and applied to the Hamburg Theatre and was constitutional. Mall Real Estate filed a notice of appeal. The district court stayed enforcement of the ordinance pending the outcome of this appeal. On appeal, Mall Real Estate argues the ordinance does not apply to the Hamburg Theatre, conflicts with state law, and violates the Iowa Constitution. Mall Real Estate bases its preemption argument on its assertion that the Hamburg Theatre is a theater for the purposes of Iowa Code section 728.5 (2009).[4] The City asserts it may pass valid zoning and licensing regulations. At trial, the parties agreed the sections of the ordinance relating to zoning would not

---

[4]All references to the Iowa Code are to the 2009 Code unless otherwise noted.

affect Mall Real Estate because the Hamburg Theatre preexisted the ordinance. Therefore, we have no reason to consider any part of the ordinance related to zoning.

## II. Issues.

Because the issue of whether state law preempts the City's ordinance is dispositive of this appeal, we need not reach the constitutional issues raised.

## III. Scope of Review.

We review whether state law preempts a municipal ordinance for correction of errors of law because it is a question of statutory construction. *Hensler v. City of Davenport*, 790 N.W.2d 569, 578 (Iowa 2010).

## IV. Whether the Iowa Code Preempts the Hamburg Ordinance.

Mall Real Estate asserts the Hamburg ordinance conflicts with state law because section 728.5 contains a theater exception and the Hamburg ordinance does not. Mall Real Estate bases this argument on two other district court decisions that the district court distinguished as dealing with different statutes under different facts and circumstances. The City responds by arguing section 728.11 allows local governments to pass ordinances related to zoning and licensing of such businesses.

Section 728.5 exempts theaters from the statewide ban of public nudity. *See* Iowa Code § 728.5. Section 728.11 contains a uniform application provision. It provides:

> In order to provide for the uniform application of the provisions of this chapter relating to obscene material applicable to minors within this state, it is intended that the sole and only regulation of obscene material shall be under the provisions of this chapter, and no municipality, county or other governmental unit within this state shall make any law, ordinance or regulation relating to the availability of obscene materials. All such laws, ordinances or regulations

shall be or become void, unenforceable and of no effect on January 1, 1978. Nothing in this section shall restrict the zoning authority of cities and counties.

*Id.* § 728.11.

In construing statutes, our goal is to ascertain legislative intent. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004). In doing so, we consider the language the general assembly used in the statute, the object the general assembly sought to accomplish, and the wrong the general assembly sought to remedy. *Swainston v. Am. Family Mut. Ins. Co.*, 774 N.W.2d 478, 482 (Iowa 2009). When the general assembly places preemption language in more than one relevant section of the chapter, we must consider both sections together in order to ascertain the general assembly's intent. *See Feld v. Borkowski*, 790 N.W.2d 72, 83–85 (Iowa 2010) (Appel, J., concurring in part and dissenting in part) (explaining that we may examine an issue that is inextricably intertwined with another issue). Here, the general assembly has placed preemption language in sections 728.5 and 728.11. *See* Iowa Code §§ 728.5 (excepting theaters from the provisions of this section), .11 (stating chapter 728 shall be the sole regulation of obscene material in the state). Therefore, we must look at these statutes together to determine whether state law preempts the Hamburg ordinance.

The Iowa Constitution was amended in 1968 to provide municipal governments with limited powers of legislative home rule. Iowa Const. art. III, § 38A. The home rule amendment provides:

> Municipal corporations are granted home rule power and authority, not inconsistent with the laws of the general assembly, to determine their local affairs and government, except that they shall not have power to levy any tax unless expressly authorized by the general assembly.

> The rule or proposition of law that a municipal corporation possesses and can exercise only those powers

granted in express words is not a part of the law of this state.

*Id.* "The purpose of the home rule amendment was to give local government the power to pass legislation over its local affairs subject to the superior authority of the legislature." *Hensler*, 790 N.W.2d at 584. Thus, "[u]nder legislative home rule, the legislature retains the unfettered power to prohibit a municipality from exercising police powers, even over matters traditionally thought to involve local affairs." *City of Davenport v. Seymour*, 755 N.W.2d 533, 538 (Iowa 2008).

Courts have developed the doctrine of preemption to determine whether the legislature permits or prohibits municipal action. *Id.* Under the doctrine, municipalities generally cannot act if the legislature has directed otherwise. *Id.* A municipality, however, may set standards "more stringent than those imposed by state law, unless a state law provides otherwise." Iowa Code § 364.3(3); *Sioux City Police Officers' Ass'n v. City of Sioux City*, 495 N.W.2d 687, 693 (Iowa 1993). Nevertheless, "legislative power trumps the power of local authorities" when the legislature exercises its power. *Seymour*, 755 N.W.2d at 538. We have recognized express preemption, implied conflict preemption, and implied field preemption. *Hensler*, 790 N.W.2d at 585.

We believe the Iowa Code expressly preempts the City from fully enforcing its ordinance. "Express preemption applies when the legislature has explicitly prohibited local action in a given area." *Id.* Express preemption is consistent with the notion that " '[l]imitations on a municipality's power over local affairs are not implied; they must be imposed by the legislature.' " *Seymour*, 755 N.W.2d at 538 (quoting *City of Des Moines v. Gruen*, 457 N.W.2d 340, 343 (Iowa 1990)).

We have previously construed section 728.11 to mean that chapter 728 expressly prohibits a municipality from enacting an ordinance regulating obscenity. In *Chelsea Theater Corp. v. City of Burlington*, 258 N.W.2d 372 (1977), we examined a 1975 Burlington ordinance "defining and prohibiting the sale and distribution of obscene material and public displays of explicit sexual material." 258 N.W.2d at 373. In response to the enactment of this ordinance, an "adult" movie theater operator brought an action against the city to enjoin the enforcement of the ordinance. *Id.* The movie theater asked us to determine whether section 728.11's predecessor, Iowa Code section 725.9 (1975), preempted the city from enacting an ordinance regulating material that is regulated by the state. *Id.* Burlington contended section 725.9 only preempted the city from enacting an ordinance regulating the dissemination of obscene materials to minors. *Id.*

After looking at the legislative history of section 725.9, we determined section 725.9 was not limited to the dissemination of obscene materials to minors and instead restricted governmental subdivisions from enacting any local ordinances regulating conduct covered in chapter 725, now chapter 728. *Id.* at 374. The United States Supreme Court had come to the same conclusion when reviewing a conviction from the United States District Court for the Southern District of Iowa for a violation of a federal statute prohibiting the mailing of obscene materials. *See Smith v. United States*, 431 U.S. 291, 293–95, 97 S. Ct. 1756, 1760–61, 52 L. Ed. 2d 324, 331–32 (1977) (holding section 728.11's predecessor, section 725.9, preempted all local regulation of obscene materials and was not restricted in application to the dissemination of obscene materials to minors). Accordingly, in *Chelsea Theater*, we held

the Burlington obscenity ordinance was irreconcilable with section 725.9 and thus preempted by state law.  258 N.W.2d at 374.

Thus, the scope of section 728.11 is broad.  Since our decision in *Chelsea Theater*, the general assembly has kept section 728.11 intact. Section 728.11 continues to provide for the uniform application of the provisions of chapter 728 relating to materials covered by chapter 728. By its terms, section 728.11 prohibits local governments from regulating obscene material or the availability of obscene material.  The parties did not argue nor do we find a reason to overrule our decision in *Chelsea Theater*.  Moreover, the general assembly has chosen not to overrule *Chelsea Theater*.  When an interpretation by the court is left undisturbed by the general assembly for a substantial period, we have to presume the general assembly agreed with the court's interpretation.  *Chi. Cent. & Pac. R.R. v. Calhoun Cnty. Bd. of Supervisors*, 816 N.W.2d 367, 374 (Iowa 2012).  Therefore, it is quite evident the Iowa Code preempts any local regulation of obscene materials.  Accordingly, to the extent the Hamburg ordinance regulates obscene material, it is preempted by state law.

The Hamburg ordinance does not hide its intent to regulate obscene material.  It states, "[I]t is neither the intent nor effect of this ordinance to restrict or deny access by adults to sexually oriented materials protected by the First Amendment to the Constitution of the United States of America."  Hamburg, Iowa, Code § 48.010.01.  Because the ordinance does not seek to regulate materials protected by the First Amendment, it must necessarily regulate unprotected material.  The category of unprotected speech involved here is obscenity.  *See Miller v. California*, 413 U.S. 15, 23, 93 S. Ct. 2607, 2614, 37 L. Ed. 2d 419, 430 (1973) ("This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment.").

The inquiry now turns to whether the general assembly intended section 728.11 to apply to live nude dancing. The City does not argue in its brief that live nude dancing is outside the scope of section 728.11. Instead, the City's sole argument is that section 728.11 allows the City to issue licenses and permits to persons engaged in activity otherwise covered by the statute. We disagree. The plain language of section 728.11 makes clear that section 728.11 prohibits municipalities, counties, or other governmental units from enacting laws, ordinances, or regulations concerning materials regulated under chapter 728. Section 728.11 goes further and states that all such laws, ordinances, or regulations are void or unenforceable and have no effect. The plain language of section 728.11 also creates an exception for a local government's *zoning* authority, not for its licensing or permitting authority. Accordingly, unless a local ordinance is a zoning ordinance, it is preempted to the extent it regulates material regulated by chapter 728. *See Estate of Ryan v. Heritage Trails Assocs., Inc.*, 745 N.W.2d 724, 730 (Iowa 2008) ("When the statute's language is plain and its meaning is clear, we look no further."). The parties and the district court recognized this when the parties agreed and the district court ruled that any part of the ordinance pertaining to zoning would be unaffected by this lawsuit.

Even though the City does not argue that section 728.11 does not apply to live nude dancing, we must reach this issue because the outcome of this case hinges on the applicability of section 728.11 and its interaction with section 728.5. *See Feld*, 790 N.W.2d at 85 (Appel, J., concurring in part and dissenting in part).

We believe the general assembly intended section 728.11 to apply to live nude dancing. At the time of our decision in *Chelsea Theater*, the Iowa Code did not contain any provisions specifically regulating the

showing of "adult" movies or nude dancing. *See* Iowa Code ch. 725 (1975). The general assembly began regulating nude dancing and "adult" movie theaters around the time of our decision in *Chelsea Theater*. *See* 1976 Iowa Acts ch. 1245(1), § 2505 (codified at Iowa Code § 728.5 (Supp. 1977)). The general assembly made it a serious misdemeanor for an owner, manager, or person who exercised direct control over a business holding a liquor license or beer permit to allow nudity or display motion pictures depicting sex acts or nudity in a licensed premise. *Id.* The statute carved out an exception for theaters and performing arts venues if the displayed nudity or sex act was part of the performance. *Id.*

After our decision in *Chelsea Theater* and prior to the passage of the Hamburg ordinance, the general assembly passed three bills amending section 728.5. In 1978, the general assembly made the advertisement of any activity prohibited by the statute a serious misdemeanor. 1978 Iowa Acts ch. 1068, § 6 (codified at Iowa Code § 728.5(6) (1979)). In 1992, the general assembly amended the statute to criminalize live sex acts by minors. 1992 Iowa Acts ch. 1029, § 1 (codified at Iowa Code § 728.5(7) (1993)).

In 1997, the general assembly expanded the scope of persons who could be found guilty of a serious misdemeanor from an owner, manager, or person who exercises direct control over a business holding a liquor license or beer permit to an owner, manager, or person who exercises direct control over a business requiring a sales tax permit. 1997 Iowa Acts ch. 125, § 3 (codified at Iowa Code § 728.5 (Supp. 1997)). The amendment also stopped regulating the display of motion pictures depicting sex acts or nudity. *Id.* The amendment, however, maintained the exception for theaters. *Id.* Section 728.5 remained unchanged from

this amendment to the time Hamburg passed its ordinance in 2008.[5] It prohibits actual or simulated sex acts and nudity in certain establishments. Iowa Code § 728.5.

These amendments make three important facts clear. First, since section 728.5 first went into effect in 1977, a provision regulating nude dancing has always been part of the obscenity chapter of the Iowa Code. Second, the general assembly has amended the provision regulating nude dancing three times since its enactment and never removed it from the obscenity chapter of the Iowa Code. Third, in regulating nude dancing, the general assembly has continued to exempt theaters. The City does not contend that Mall Real Estate does not operate a theater.

Nonetheless, an argument can be made that the general assembly did not intend section 728.11 to apply to live nude dancing because of the definition of "material" in chapter 728. Section 728.1(3) defines "material" as the following:

> [A]ny book, magazine, newspaper or other printed or written material or any picture, drawing, photograph, motion picture, or other pictorial representation or any statue or other figure, or any recording, transcription or mechanical, chemical or electrical reproduction or any other articles, equipment, machines or materials.

Iowa Code § 728.1(3). We acknowledge the commentators who have opined the restriction on local government regulation of obscenity does not appear to apply to live performances because the definition of "material" in section 728.1(3) does not appear to include live performances. *See* 4 John L. Yeager & Ronald L. Carlson, *Iowa Practice:*

---

[5]In 2010, the general assembly amended the statute again. *See* 2010 Iowa Acts ch. 1078, § 2 (codified at Iowa Code § 728.5 (2011)). This amendment renumbered the subsections of section 728.5 and made the theater exception inapplicable to certain portions of the statute. *See id.*

*Criminal Law and Procedure* § 640, at 159–60 (1979). However, these same commentators also acknowledge it was the general assembly's intent to regulate live performances and believe the failure of the general assembly to include live performances in the definition of "material" in section 728.1(3) "was in all probability an oversight." *Id.* § 631, at 156. We agree that the general assembly intended to regulate live performances as part of the "material" regulated by chapter 728. However, for the reasons explained below we disagree with these commentators' opinion that the definition of "material" does not include live performances.

It is not unusual for an obscenity statute to explicitly include live performances within the scope of the term "material" or "materials." *See, e.g., Waterman v. Farmer*, 84 F. Supp. 2d 579, 580–81 (D.N.J. 2000) (interpreting a New Jersey statute that included live performances in the definition of "sexually oriented material"); *State v. Sorabella*, 891 A.2d 897, 930 (Conn. 2006) (interpreting a statute defining "child pornography" as "any material involving a live performance or photographic or other visual reproduction of a live performance which depicts a minor in a prohibited sexual act"); *Ferrari v. Commonwealth*, 859 N.E.2d 808, 810 & n.6 (Mass. 2007) (noting the definition of "matter" includes live performances for the purposes of a criminal statute prohibiting the dissemination of certain material to minors); *State v. Foglia*, 440 A.2d 16, 16 (N.J. Super. Ct. App. Div. 1981) (interpreting a statute criminalizing the sale of obscene material to minors where the definition of "obscene material" included "live performance"); *State v. Bahl*, 193 P.3d 678, 689 n.8 (Wash. 2008) (en banc) (noting the statutory definition of "erotic materials" includes live performances). Although Iowa Code section 728.1(3) does not specifically mention "live

performances," it is clear from the above cases that the term "material" is often defined to include live performances, particularly when the term is used in an obscenity statute. The question becomes whether the phrase "or any other . . . materials" in Iowa Code section 728.1(3) should be interpreted to include live performances even though the legislature did not explicitly mention live performances.

In order to go outside of the plain language of section 728.1(3), we must find an ambiguity in the statute. *See Estate of Ryan*, 745 N.W.2d at 730. To determine whether a statute is ambiguous, we apply the following rules:

> A statute is ambiguous if reasonable minds could differ or be uncertain as to the meaning of the statute. Ambiguity may arise from specific language used in a statute or when the provision at issue is considered in the context of the entire statute or related statutes.

*Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 424–25 (Iowa 2010) (citations and internal quotation marks omitted). We also interpret statutes in such a way that portions of it do not become redundant or irrelevant. *State v. Gonzalez*, 718 N.W.2d 304, 308 (Iowa 2006). Additionally, we do not place undue importance on any single or isolated portion, but instead consider all parts of an enactment together. *Swainston*, 774 N.W.2d at 482. The general assembly did not enact section 728.1 in isolation, but rather as one piece of the legislation that contained the original provisions of chapter 728. *See* 1976 Iowa Acts ch. 1245(1), §§ 2505, 2801–10 (codified at Iowa Code ch. 728 (Supp. 1977)).

On its face, section 728.1(3)'s definition is recursive. A defining term of "material" is "or any other . . . materials." A recognized definition of "material" is "a performer's repertoire." *Merriam-Webster's Collegiate Dictionary* 765 (11th ed. 2005). This definition would include live

performances, including nude and seminude dancing. However, one could also reasonably conclude "material" refers to inanimate objects, such as a table or book. Thus, reasonable minds could differ as to the meaning of "materials" when it is used to define the term "material." Ordinarily, we would apply the "canon of construction *noscitur a sociis*, which summarizes the rule of both language and law that the meanings of particular words may be indicated or controlled by associated words." *Peak v. Adams*, 799 N.W.2d 535, 547 (Iowa 2011) (citation and internal quotation marks omitted). Applying this canon, we would examine the longer phrase: "or any other articles, equipment, machines or materials." Application of this canon could lead one to conclude that the defining term "materials" must refer to inanimate objects. However, we cannot apply this canon if its application thwarts legislative intent or makes the general words meaningless. 2A Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 47:16, at 355 (7th ed. 2007); *accord Wright v. State Bd. of Eng'g Exam'rs*, 250 N.W.2d 412, 414 (Iowa 1977). For several reasons, we believe this is one of those occasions when the canon is not applicable.

First, application of the canon would lead to an absurd result that would thwart the legislative intent. *See Harden v. State,* 434 N.W.2d 881, 884 (Iowa 1989) ("We seek a reasonable interpretation that will best effect the purpose of the statute and avoid an absurd result."). In chapter 728, the general assembly prohibited any person from disseminating obscene material to minors. *See* Iowa Code § 728.2. One of the practical effects of this limitation is that it prohibits the operator of an adult movie theater displaying films containing obscene sex acts from displaying such films to a minor. Indeed, the movie theater operator is prohibited from even admitting a minor to the premises. *Id.* § 728.3.

However, if we did not construe "material" to include live performances, then that same minor could view the same obscene sex act live in an establishment falling under the theater exception of section 728.5. We find it hard to believe the general assembly intended to permit minors to view live obscene sex acts but prohibit them from viewing the same obscene sex act on a movie theater screen. Thus, to construe the definition of "material" to not include live performances would thwart legislative intent.

Second, "or other . . . materials" must necessarily mean something unique from the rest of the defining terms. The list of items contained in section 728.1(3) is all-inclusive. It covers all conceivable inanimate objects that could constitute "material" for the purposes of the obscenity chapter. If the legislature did not give "or other . . . materials" a meaning other than an inanimate object, the word would become surplusage. *See Iowa Auto Dealers Ass'n v. Iowa Dep't of Revenue & Fin.*, 301 N.W.2d 760, 765 (Iowa 1981) (stating that we give effect to all the words in the statute unless no other construction is reasonably possible). Therefore, "or other . . . materials" must refer to something other than an inanimate object, at least in the context of the obscenity chapter.

Third, the uniformity provision in section 728.11 is a strong indication of the general assembly's desire to establish statewide regulation of obscenity. The placement of section 728.5, which pertains to live performances in the obscenity chapter, is indicative of the general assembly's intent to include its regulation of live performances in this statewide scheme. *See In re Det. of Garren,* 620 N.W.2d 275, 280 (Iowa 2000) ("The legislature's intent to enact a civil statute is also implied from the placement of the [Sexually Violent Predator Act] among code chapters dealing with the mentally ill . . . ."); *State v. Iowa Dist. Ct.,* 616

N.W.2d 575, 579 (Iowa 2000) (holding the placement of a statute mandating a minimum sentence for certain felonies in the chapter governing felonies rather than the chapter governing sentence reduction indicated a legislative intent to operate as a minimum sentence for felons and not a restriction on the power of a parole board); s*ee also NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) ("Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used."). We must read chapter 728 as a whole.  By including within the obscenity chapter a section pertaining to live performances of a sexual nature, it is reasonable to infer based on the particular characteristics of chapter 728 that the general assembly intended live performances to be within the scope of the term "or other . . . materials."

Finally, the underlying issues in this case involve delicate issues of free speech under the Iowa Constitution.  The doctrine of constitutional avoidance counsels us to construe section 728.1(3) in a fashion to avoid constitutional issues.  *See Simmons v. State Pub. Defender*, 791 N.W.2d 69, 74 (Iowa 2010); *State v. Nail*, 743 N.W.2d 535, 539 (Iowa 2007); *see also Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 345–48, 56 S. Ct. 466, 482–84, 80 L. Ed. 688, 710–12 (1936) (Brandeis, J., concurring) (famously observing that constitutional adjudication is a matter of "great gravity and delicacy" and discussing the principles of constitutional avoidance).  In considering whether a local ordinance is preempted under state law, the preemption question is regarded as a question of statutory construction.  *See Puerto Rico Tel. Co. v. Municipality of Guayanilla*, 450 F.3d 9, 13 (lst Cir. 2006); *N.J. Payphone Ass'n, Inc. v. Town of W. N.Y.*, 299 F.3d 235, 239 n.2 (3d Cir. 2002).  Thus, unlike an ordinary preemption case, where a court construes statutes to avoid preemption,

a court faced with an important constitutional question should seek to interpret statutes in a fashion to avoid constitutional issues.

Accordingly, we find the general assembly intended to include live performances in the definition of "material" for the purposes of chapter 728. Therefore, to be consistent with our construction of section 728.11 in *Chelsea Theater*, we must find that section 728.11 preempts the City from enacting any ordinance regulating nude dancing in a theater. Until the general assembly amends section 728.11, the City is without authority to regulate nude dancing.[6] Accordingly, we reverse the judgment of the district court and remand this case for the court to enter an order enjoining the City from enforcing its ordinance regulating nude dancing in the Hamburg Theatre. Our ruling today does not prevent the City from enforcing its laws or state laws dealing with controlled substances, prostitution, loitering, littering, the service of alcoholic beverages to adults or minors, the consumption of alcoholic beverages by minors, or valid zoning laws.

**V. Disposition.**

Having found that state law preempts the City of Hamburg's ordinance because the ordinance attempts to regulate nude dancing, we reverse the judgment of the district court and remand the case to the district court with instructions to enter an order enjoining the City of Hamburg from enforcing its ordinance against Mall Real Estate.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

All justices concur except Cady, C.J., and Waterman, J., who dissent separately and Mansfield, J., who takes no part.

---

[6]Although we conclude the general assembly intended nude and seminude dancing to be within the scope of section 728.11, we do not express any opinion as to the constitutionality of any provision in chapter 728 because it is beyond the scope of this appeal.

**CADY, Chief Justice (dissenting).**

I respectfully dissent from the decision by the majority.

Our legislature intended to regulate obscenity by regulating "obscene material," and it sought to do so exclusively through express preemption. *See* Iowa Code § 728.11 (2009) ("In order to provide for the uniform application of the provisions of this chapter relating to obscene material applicable to minors within this state, it is intended that the sole and only regulation of obscene material shall be under the provisions of this chapter . . . ."). To accomplish this regulation, the legislature enacted chapter 728 and defined both "obscene material" and "material." *See* Iowa Code § 728.1(3), (5). We are ordinarily bound to follow legislative definitions. *Inter-State Nurseries, Inc. v. Iowa Dep't of Revenue*, 164 N.W.2d 858, 861 (Iowa 1969). The legislative definition of "obscene material" relates to material that depicts or describes obscene matters, and the definition of "material" relates to the various mediums used to depict or describe obscene matter. *See* Iowa Code § 728.1(3), (5). These definitions express the scope of the regulation intended by the legislature, as well as the scope of preemption of local regulation.

The legislature defined the term "material" by listing five categories of material containing twenty-one or more specific items:

> 1. "[A]ny book, magazine, newspaper or other printed or written material";
> 2. "[A]ny picture, drawing, photograph, motion picture, or other pictorial representation";
> 3. "[A]ny statue or other figure";
> 4. "[A]ny recording, transcription, or mechanical, chemical, or electrical reproduction";
> 5. "[A]ny other articles, equipment, machines or materials."

*See id.* § 728.1(3). The question of statutory interpretation in this case is whether this definition includes the act of nude erotic dancing by a live performer. The majority concludes the legislature intended for nude dancing to be included within the meaning of the word "materials." In other words, in the judgment of the majority, "materials" means a dancer to our legislature. This conclusion not only defies common sense, it defies our accepted rules of construction.

Two intrinsic aids are commonly used to find the legislative intent of statutes that define a particular concept by using a list of descriptive words. The first aid is the *noscitur a sociis* doctrine, which provides that the meaning of ambiguous words is determined by reference to their relationship with associated words and phrases. *Peak v. Adams,* 799 N.W.2d 535, 547–48 (Iowa 2011) (describing *noscitur a sociis* as a canon of construction that " 'summarizes the rule of both language and law that the meanings of particular words may be indicated or controlled by associated words' " (quoting 11 Richard A. Lord, *Williston on Contracts* § 32:6, at 432 (4th ed. 1999))). The coupling of words ordinarily denotes an intention that the words should be understood in the same general sense. 2A Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 47:16, at 353 (7th ed. 2007) [hereinafter Singer]. In other words, the meaning of a word is judged by the company the word keeps. *State v. Merino,* 915 P.2d 672, 691 (Haw. 1996). The doctrine was perhaps most colorfully explained by Lord Macmillan as "words of a feather flock together." Hugh Pattison Macmillan, Rt. Hon. Lord, *Law and Language,* Presidential Address to the Holdsworth Club (May 15, 1931).

The *noscitur a sociis* doctrine is accepted in the law to discern legislative intent because it reflects the accepted way people write and

speak about a particular topic. Good communication is built by weaving a set of words together to create what linguists call semantic fields, words that share a common meaning and allow the topic to be understood as a connected text rather than a disconnected thought. Just as good writing seeks to eliminate unrelated words because they confuse the message, good interpretation seeks to construe ambiguous words as connected, not unrelated.

If, for the moment, the disputed word in this case—materials—is removed from the twenty-one-word list of section 728.1(3), all five categories and every descriptive word within each category describe various mediums that can be used to depict or display inanimate obscene pornography. The mediums listed have been used to create a multibillion-dollar commercial industry that distributes pornographic material worldwide. When the word "materials" is then added back into the definition in section 728.1(3), its meaning is logically derived from its associated words. Our legislature, like people in general, would not construct a list of twenty ways to distribute inanimate obscene material and then add a new topic of animate displays of obscenity to the definition by adding the word "materials" at the end of the list. Clearly, the application of the doctrine of associated words would exclude live performing arts from the definition of "material." Under the *noscitur a sociis* doctrine, the word "materials" would mean any mediums used to display inanimate obscene pornography not specifically listed.

The second intrinsic aid, *ejusdem generis*, is a variation of the first and describes a common drafting technique that allows lawmakers to capture all of the intended applications of the statute. *See* 2A Singer § 47:17, at 357, 370–73. This doctrine attempts to reconcile the incompatibility between specific and general words so that all parts of a

statute are construed together, and no words are rendered superfluous. *Id.* at 375–76. This maxim treats specific words as expressing a class or topic and a general word within the same group as a means of extending the statute to include everything within the class, though not specifically listed. *Id.* § 47:18, at 378. The doctrine is not just semantics and formal logic. *Id.* at 382. Instead,

> [i]t rests on practical insights about everyday language usage. When people list a number of particulars and add a general reference like "and so forth," they mean to include by use of the general reference not everything else but only others of the like kind.

*Id.*

Like the first doctrine, this maxim also reveals our legislature did not intend to include the act of dancing within the definition of material. The definition lists only inanimate mediums and concludes with a catchall category of "*any other* articles, equipment, machines or materials." *See* Iowa Code § 728.1(3) (emphasis added). The *ejusdem generis* doctrine reveals the legislature used the last category of more general words to expand the definition of material to include everything embraced within the class of medium capable of displaying or depicting inanimate, obscene pornography. Moreover, the words "articles," "equipment," and "machines" in the catchall category do not describe a new class of animate means of displaying pornography so that the meaning of "materials" could include nude dancing. Accordingly, like the first intrinsic aid, the doctrine of *ejusdem generis* does not support the conclusion of the majority. *See Fleur de Lis Motor Inns, Inc. v. Bair*, 301 N.W.2d 685, 690 (Iowa 1981) (indicating the doctrines of *noscitur a sociis* and *ejusdem generis* normally produce identical results).

I acknowledge that neither of these intrinsic aids should be followed by courts when there is a clear, contrary legislative intent. Yet, there is nothing about the statute in question or any other rules of construction that manifest an intent to regulate the subject of obscenity in the live performing arts. The contrary conclusion by the majority is, in its best light, unpersuasive.

First, reasonable people would agree that our legislature could logically choose to regulate the distribution of inanimate obscene materials without also regulating obscenity in the live performing arts. The legislature could, of course, preempt both areas, but the two are not so compatible that a court interpreting a preemption statute could conclude it would be absurd to only preempt local regulation of inanimate obscene materials and not obscene live dancing. In fact, it makes perfect sense for our legislature to regulate the obscene pornography industry statewide but permit local government to participate in the regulation of live nude dancing in their communities. Live nude dancing raises problems quite different from traffic in inanimate obscene pornography. Additionally, it would make perfect sense for our legislature to regulate the distribution of obscene pornography to minors in the form of film shown by movie theaters and to leave it to local government to regulate access by minors to places that provide live adult entertainment. Contrary to the claim of the majority, such an approach would not mean our legislature would have intended to permit minors to view live obscene sex acts by excluding live dancing from the subject in the preemption. Preemption is a doctrine of legislative authority to exclusively regulate an area. It does not express a legislative intent to permit conduct that falls outside of the preempted area. For example, our legislature did not intend to countenance

overtime parking in society by failing to include state provisions governing overtime parking within its laws governing the operation of motor vehicles.

Thus, for the majority to conclude it would be absurd for our legislature to have left nude dancing out of its preemption scheme is itself absurd. Additionally, the absurd-results doctrine followed by the majority must only be utilized sparingly due to the risk of displacing legislative policy with judicial policy based on speculation. *Kolzow v. State*, 813 N.W.2d 731, 739 (Iowa 2012) ("We use the absurd results doctrine sparingly because of the risk of displacing legislative policy."); 2A Singer § 45:12, at 105–07. When there is no basis to claim an absurd result, there is no claim to use the doctrine.

Second, the list of items in section 728.1(3) may be fairly comprehensive, but hardly all inclusive, so as to render the meaning of the term "other . . . material" as surplusage, as asserted by the majority. Ordinarily, it is nearly impossible to spell out every condition in a statute, making it common for legislators to use general words in conjunction with specific enumerative words to include additional contingencies. *See* 2A Singer § 47:17, at 370–73. The approach taken by the majority to declare the specific enumerated terms of the statute to be all inclusive undermines our law and logic. It is inconsistent with the accepted legislative drafting technique of using catchall phrases to capture the entire scope of the statute. Commonly, catchall phrases are used to allow a statute to maintain its relevancy in the face of our ever-changing society. For example, in this case, the catchall phrase in section 728.1(3) would allow the statute to not only capture all current mediums of the distribution of inanimate obscene material, but also new

mediums that surely will be developed in the future as technology continues to change.

Third, words in a statute are to be given their common meaning. *Severs v. Abrahamson*, 255 Iowa 979, 981, 124 N.W.2d 150, 152 (1963). There is no legal principle that allows the secondary meaning of a word to change the topic of a statutory definition, especially when the secondary meaning has little, if any, connection to the new topic sought to be introduced. In this case, the word "materials" may have a secondary meaning relating to the repertoire of a performer, but the meaning of "repertoire" is itself a torturous way to express an intent to include live nude dancing. Nevertheless, the legislature would not use a word with a primary meaning consistent with the other associated words in a statutory definition to create a new topic in the definition derived from a secondary meaning of the word. In other provisions of chapter 728, the legislature expressly criminalizes public indecent exposure by persons. Iowa Code § 728.5. Yet, the preemption provision at issue is limited to obscene *materials. See id.* § 728.11. If the legislature intended to preempt local regulation of live acts, it would have said so in section 728.11.

Fourth, courts must attempt to construe statutes in a way that does not render them unconstitutional. 2A Singer § 45:11, at 80–81. This approach means courts are to interpret a statute in a way that supports its constitutionality when the statute is open to two reasonable constructions. *See id.* In this case, the word "materials" in section 728.1(3) is not open to two reasonable constructions in the context of the statute.

Fifth, it is of no value to string together cases from other jurisdictions where legislatures have specifically defined obscenity to

include live performances. As previously indicated, it would be a reasonable approach for a state to regulate both inanimate obscene material and live nude dancing. Nevertheless, it would be just as reasonable to regulate obscenity using a combination of state and local government regulations. The question for us in this case is to determine the approach taken in Iowa, not the approach taken in other states. Any reference to a string of authorities from other states appears facially impressive, but is totally irrelevant.

Finally, in *Dingman v. City of Council Bluffs*, 249 Iowa 1121, 90 N.W.2d 742 (1958), we said the plain, obvious, and rational meaning of a statute is always preferred over any curious, narrow, hidden sense that is only uncovered by ingenuity and intellect. 249 Iowa at 1127, 90 N.W.2d at 746–47. The majority has failed to heed this admonition. Our legislature did not intend for the word "materials" to mean nude, erotic dancing. A square peg simply will not fit into a round hole.

Therefore, I would conclude state law did not preempt Hamburg's ordinance. The Iowa legislature did not deprive local governments of the ability to regulate live nude dancing. Therefore, we should address the substantive issue of whether the restrictions imposed by the Hamburg ordinance violate our Iowa Constitution's prohibition of laws abridging the freedom of speech. Because the majority does not address the issue, however, I will leave it for another day to express my views in this area and simply dissent from the decision made by the majority.

**WATERMAN, Justice (dissenting).**

I respectfully dissent from the majority opinion. I join in the preemption analysis of Chief Justice Cady's dissent, but would reach the merits and conclude the City of Hamburg's ordinance restricting conduct at defendant's strip club, Shotgun Geniez, is constitutional under well-settled precedent. The majority erroneously deprives local governments of the ability to regulate such establishments in our state and unfairly blames the legislature for this outcome. As Chief Justice Cady explains, *live* nude dancing simply does not fall within the definition of "obscene materials" in Iowa Code section 728.1(2), (5) (2009) in which the legislature prescribed a list of *inanimate* objects like photos, movies, and magazines that are removed from local regulation by the preemption provision in section 728.11 that is expressly limited to obscene materials.

The strip club challenges the ordinance under article I, section 7 of the Iowa Constitution, but offers no persuasive reason to diverge from settled federal precedent in applying the Iowa constitutional protections for speech and expressive conduct. I believe the protection for the expressive conduct at issue is the same under the Iowa and Federal Constitutions. *See In re Adoption of S.J.D.*, 641 N.W.2d 794, 802 (Iowa 2002) ("The Iowa Constitution also protects free speech and imposes the 'same restrictions on the regulation of speech as does the Federal Constitution.' " (quoting *State v. Milner,* 571 N.W.2d 7, 12 (Iowa 1997))); *Des Moines Register & Tribune Co. v. Osmundson,* 248 N.W.2d 493, 498 (Iowa 1976) ("We believe the federal and state constitutional provisions, which contain almost identical language, impose the same limitation on abridgement of freedom of the press.").

Although federal precedent makes clear nude dancing is protected expressive conduct, it is "within the outer perimeters of the First Amendment" and only "marginally so." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566, 111 S. Ct. 2456, 2460, 115 L. Ed. 2d 504, 511 (1991) (plurality); *accord City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S. Ct. 1382, 1391, 146 L. Ed. 2d 265, 278 (2000) (plurality) (stating nude dancing "falls only within the outer ambit of the First Amendment's protection"). The expressive conduct at issue in this case, including pole dancing, is a far cry from the heart of the First Amendment—protection for political speech and debate to better inform the citizenry for self-government. *See Knox v. Serv. Emps. Int'l Union, Local 1000*, ___ U.S. ___, ___, 132 S. Ct. 2277, 2288, 183 L. Ed. 2d 281, 296 (2012).[7] As Justice Stevens aptly observed, "it is manifest that society's interest in protecting [erotic] expression is of a wholly different, and lesser,

---

[7]The *Knox* Court this summer summarized the core First Amendment values as follows:

> Our cases have often noted the close connection between our Nation's commitment to self-government and the rights protected by the First Amendment. See, *e.g., Brown v. Hartlage*, 456 U.S. 45, 52, 102 S. Ct. 1523, 1528, 71 L. Ed. 2d 732, 740 (1982) ("At the core of the First Amendment are certain basic conceptions about the manner in which political discussion in a representative democracy should proceed[.]"); *Buckley v. Valeo*, 424 U.S. 1, 93, n. 127, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976) *(per curiam)* ("[T]he central purpose of the Speech and Press Clauses was to assure a society in which 'uninhibited, robust, and wide-open' public debate concerning matters of public interest would thrive, for only in such a society can a healthy representative democracy flourish[.]"); *Cox v. Louisiana*, 379 U.S. 536, 552, 85 S. Ct. 453, 13 L. Ed. 2d 471 (1965) ("Maintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy[.]"); *Whitney v. California*, 274 U.S. 357, 375, 47 S. Ct. 641, 71 L. Ed. 1095 (1927) (Brandeis, J., concurring); *Patterson v. Colorado ex rel. Attorney General of Colo.*, 205 U.S. 454, 465, 27 S. Ct. 556, 51 L. Ed. 879 (1907) (Harlan, J., dissenting).

*Knox*, ___ U.S. at ___, 132 S. Ct. at 2288, 183 L. Ed. 2d at 296.

magnitude than the interest in untrammeled political debate" and "few of us would march our sons and daughters off to war to preserve the citizen's right" to view nude dancing or receive lap dances.  *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 70, 96 S. Ct. 2440, 2452, 49 L. Ed. 2d 310, 326 (1976) (plurality). Most importantly, the First Amendment and its Iowa counterpart protect the right of citizens to criticize government officials.  That is not what the strippers are doing at Shotgun Geniez.

The Supreme Court has twice upheld state laws requiring nude dancers to wear "G-strings" and "pasties," concluding the restrictions imposed *de minimis* infringement on marginally protected speech while legitimately targeting undesirable secondary effects associated with sexually oriented business.  *See Pap's A.M.*, 529 U.S. at 294, 120 S. Ct. at 1393, 146 L. Ed. 2d at 281 (reasoning a ban on total nudity arguably "has some minimal effect on the erotic message by muting that portion of the expression that occurs when the last stitch is dropped," but "[a]ny effect on the overall expression is *de minimis*"); *Glen Theatre, Inc.*, 501 U.S. at 571, 111 S. Ct. at 2463, 115 L. Ed. 2d at 514 (reasoning the G-string and pasties requirement "does not deprive the dance of whatever erotic message it conveys").

I believe Iowa local governments may enact restrictions designed to limit undesirable secondary effects such as prostitution, assault, and drug distribution associated with strip clubs in their own communities, unless the restrictions "so interfere[] with the message that it essentially bans the message." *Pap's A.M.*, 529 U.S. at 293, 120 S. Ct. at 1393, 146 L. Ed. 2d at 280.  The City of Hamburg's ordinance restricts total nudity in a manner upheld by the Supreme Court.  *Id.*  The ordinance also prevents the strip club from selling alcohol, which is unrelated to the erotic message.  The ordinance further requires sexually oriented

business to close by 2 a.m., restricts consumption of alcohol brought in by patrons, requires dancers to perform on a stage at least six feet from customers, and limits how customers can properly tip dancers. In my view, all these restrictions pass constitutional muster.

The strip club complains the City's six-foot distance requirement "kills the business model." No doubt a customer's sensory appreciation of the dancer's artistic message is enhanced by the grinding physical contact of a vigorous lap dance. But, I see no constitutional right to give a paying customer a lap dance. If it is the "artistic expression" that is constitutionally protected, the City may impose reasonable time, place, and manner restrictions to curb undesirable secondary effects. A six-foot minimum distance requirement still allows a customer a full view of the dancing without the heightened risk of secondary effects encouraged by physical contact.

Numerous federal appellate courts have held restrictions like Hamburg's permissibly impose incidental and minimal burdens on the expressive message of nude dancing and constitute a legitimate effort to control the negative secondary effects associated with sexually oriented businesses. *See 84 Video/Newsstand, Inc. v. Sartini*, 455 F. App'x 541, 561–62 (6th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1637, 182 L. Ed. 2d 234 (2012) (upholding no-touch and hours restrictions against First Amendment challenge); *Fantasy Ranch Inc. v. City of Arlington*, 459 F.3d 546, 562 (5th Cir. 2006) ("[W]e hold that the effect on the overall expression is *de minimis,* as the City of Arlington has muted only that portion of the expression that occurs when the six-foot line is crossed, while leaving the erotic message largely intact."); *G.M. Enters., Inc. v. Town of St. Joseph,* 350 F.3d 631, 638 (7th Cir. 2003) (upholding a no-touching requirement because "a minimal physical buffer between

patrons and dancers does not reduce the availability of nude dance entertainment"); *Wise Enters., Inc. v. Unified Gov't of Athens-Clarke Cnty.*, 217 F.3d 1360, 1363–65 (11th Cir. 2000) (upholding ordinance preventing sale of alcohol in sexually oriented business); *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1364–65 (11th Cir. 1999) (upholding an hours-of-operation and square-foot limitation because the restrictions "do not directly regulate[] the expressive conduct that is the basis of the plaintiffs' First Amendment challenges: nude dancing"); *Farkas v. Miller*, 151 F.3d 900, 905 (8th Cir. 1998) (rejecting First Amendment challenge to Iowa statute requiring pasties and G-strings). These authorities are persuasive and should be followed when applying our Iowa constitutional protections to this case.

For these reasons, I would affirm the district court ruling upholding the City of Hamburg ordinance.